Thomas W. WHALEN, Appellant,

v.

UNITED STATES, Appellee.

No. 8583.

District of Columbia Court of Appeals.

Argued Nov. 11, 1976.

Decided Nov. 10, 1977.

W. Gary Kohlman, Public Defender Service, Washington, D. C., for appellant.

Peter E. George, Asst. U. S. Atty., with whom Earl J. Silbert, U. S. Atty., and John

A. Terry, Asst. U. S. Atty., were on the brief, for appellee.

Before KELLY, FICKLING * and YEAGLEY, Associate Judges.

YEAGLEY, Associate Judge:

At 12:30 p. m. on September 10, 1972, the partially clothed body of 26-year-old Rebecca Rieser was found lying on the floor of her room at the McLean Gardens complex in northwest Washington, D. C. The medical examiner's office determined that Ms. Rieser died sometime between 10:30 a. m. and 12:30 p. m. on that day. They discovered abrasions and signs of trauma about her neck and face, and concluded that death was caused by manual strangulation. In the course of autopsy, swabs of fluid were taken from Ms. Rieser's vagina, which when examined revealed the presence of intact sperm not more than eight hours old.

Appellant was a maintenance worker at McLean Gardens. On the morning of September 10 he had been in the approximate location of the building in which Ms. Rieser lived, for the purpose of removing from a vacant dormitory some furniture which the building manager said he could have. He had admitted to co-workers that morning of having just engaged in intercourse with someone at McLean Gardens. Later his fingerprints and palm print were found in the victim's room. Because of his duties, he had keys to all apartments and rooms at McLean Gardens.

Four days later, police arrested appellant for the rape and murder of Rebecca Rieser. At that time he was in police custody on other charges.

On October 3, 1972, a grand jury indicted appellant and charged him with fifteen counts of felony murder, rape, robbery, burglary and related offenses involving three different victims. On July 23, 1973, the court severed counts relating to the two victims other than Ms. Rieser and ultimately dismissed them on motion of the government. Trial commenced on October 9, 1973, but ended the next day in a defense requested mistrial.

Trial recommenced in Superior Court on January 8, 1974 and culminated on January 16, 1974 in jury verdicts of guilty on two counts of felony murder (the underlying felonies being rape and first-degree burglary), second-degree murder, rape, and first-degree burglary. The court granted motions for judgment of acquittal on counts charging appellant with robbery and felony murder (robbery). On March 4, 1974, appellant received concurrent sentences of 20 years to life on each felony murder count and 15 years to life for second-degree murder. He also received a sentence of 15 years to life for rape, to run consecutively with the murder sentences, and 10 to 30 years for first-degree burglary to run consecutively with the murder and rape sentences.

■ For the reasons which follow, we are compelled to reverse appellant's convictions for felony murder (first-degree burglary) and first-degree burglary. We vacate appellant's sentence for second-degree murder. We affirm appellant's convictions for felony murder (rape) and rape. We note that the action we take with regard to the offenses for which appellant received concurrent sentences will not likely affect the length of his prison term. Nonetheless, if any is founded in error we are bound to reverse in light of potential collateral consequences stemming from an invalid conviction. *Benton v. Maryland,* 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). We will dispose of the many issues raised by this appeal seriatim.[1]

## I. AMENDMENT OF THE GRAND JURY INDICTMENT (FIRST–DE-GREE BURGLARY)

The first of appellant's contentions which we address is that the trial court erred in

---

* Associate Judge Fickling was a member of this division at the time the case was argued, but died before entry of this opinion.

1. For civil litigation brought by the victim's father as a result of the incident which gave rise to this case *see Rieser v. District of Columbia,* 563 F.2d 462 (D.C.Cir., 1977).

**1156**

permitting the government to amend count seven of the indictment subsequent to its case-in-chief to conform the indictment to a ruling of the court on the absence of evidence of theft adduced at trial. Count seven charged appellant with first-degree burglary as follows:

On or about September 10, 1972, within the District of Columbia, Thomas W. Whalen entered the dwelling of Rebecca A. Rieser, while Rebecca A. Rieser was inside the said dwelling, with intent to steal the property of another and to commit an assault. D.C.Code 1973, § 22–1801(a).

After the trial court granted appellant's motion for judgment of acquittal on count two (felony murder (robbery)) and count six (robbery), agreeing that the evidence of theft presented at trial was legally insufficient, the government announced it would amend count seven to delete the words "to steal the property of another and". Defense counsel objected and argued that because no evidence of intent to steal had been adduced, the government had failed to prove count seven and that the court should dismiss the count. Instead, the trial court authorized the government to amend the count as it had proposed.

Appellant argues that in so doing, the trial court intruded impermissibly on his Fifth Amendment right to be charged for serious crimes only by grand jury indictment. We agree and reverse.

■ The first clause of the Fifth Amendment provides:

No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury.

This is applicable directly to the District of Columbia. *Barry v. Hall,* 68 App.D.C. 350, 98 F.2d 222 (1938).

■ The indictment requirement interposes ordinary citizens as a safeguard between a prospective defendant and oppressive actions of a prosecutor or a court. *Wood v. Georgia,* 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962); *Stirone v. Unit-*ed States, 361 U.S. 212, 80 S.Ct. 270, 41 L.Ed.2d 252 (1960); *Gaither v. United States,* 134 U.S.App.D.C. 154, 413 F.2d 1061 (1969). It aims to apprise the accused of charges against him so that he may prepare his defense, and to describe the crime charged with specificity sufficient to enable the accused to protect against future jeopardy for the same offense. *Gaither v. United States, supra.*

■ These purposes are violated where an indictment is amended in substance in a manner other than by resubmission to the grand jury. *Russell v. United States,* 369 U.S. 749, 770, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962). An amendment of substance occurs when the charging terms are altered by prosecutor or court after the grand jury has last passed upon them. *Gaither v. United States, supra.* We conclude that such an alteration took place in the instant case.

Indeed, the instant case is strikingly similar to *Ex Parte Bain,* 121 U.S. 1, 7 S.Ct. 781, 30 L.Ed. 849 (1887). In *Bain,* defendant, a banking officer, was charged with making a false report "with intent to deceive *the Comptroller of the Currency and* the agent appointed to examine the affairs of said association." *Id.* at 4, 7 S.Ct. at 783. The government thereafter moved for and the trial court ordered an amendment to strike the italicized words. The Supreme Court reversed petitioner's conviction, rejecting the trial judge's assertion that the grand jury would have indicted without the omitted language:

But it is not for the court to say whether they would or not. *The party can only be tried upon the indictment as found by such grand jury, and especially upon all its language found in the charging part of that instrument. . . . How can the court say that there may not have been more than one of the jurors who found this indictment who was satisfied that the false report was made to deceive the comptroller, but was not convinced that it was made to deceive anybody else? And how can it be said that, with these words stricken out, it is the indictment which was found by the grand jury? If it*

lies within the province of a court to change the charging part of an indictment to suit its own notions of what it ought to have been, or what the grand jury would probably have made it if their attention had been called to suggested changes, the great importance which the common law attaches to an indictment by a grand jury, as a prerequisite to a prisoner's trial for a crime, and without which the constitution says "no person shall be held to answer," may be frittered away until its value is almost destroyed. [*Id.* at 9–10, 7 S.Ct. at 786 (emphasis added).]

*See also Russell v. United States, supra; Stirone v. United States, supra.*

■ In the instant case, it would at best be speculative to say that the grand jury would have returned a true bill on count seven if the indictment had been presented to it as it appeared after the amendment. Although it might be logical to assume that any grand juror who would find intent to steal *and* to commit assault would also find either element individually, we cannot say that some grand jurors may not have relied primarily on the belief that appellant entered the victim's apartment with intent to steal. They may have been ambivalent on the question whether appellant also entered with intent to commit assault, and conceivably would have voted against the issuance of a true bill containing only the latter charge.

■ We are not presented with a situation in which an indictment charges several offenses, or the commission of one offense in several ways. Under such circumstances, withdrawal from the jury's consideration of one offense or one alleged method of committing it would not constitute a forbidden amendment of the indictment. *Ford v. United States,* 273 U.S. 593, 47 S.Ct. 531, 71 L.Ed. 793 (1927); *Salinger v. United States,* 272 U.S. 542, 47 S.Ct. 173, 71 L.Ed. 398 (1926). The instant case, like *Bain,* presents an unseverable, unitary charge, stated in

the conjunctive. Prior to amendment, the government had failed to prove the offense charged. As amended it was not the charge on which the grand jury indicted.

■ We read *Bain* to be concerned not only with whether the amendment technically charges a different offense, broader or narrower, than that charged in the original indictment, but to be concerned also with the sanctity of the grand jury process, the constitutional requirement that conviction rest on the actual indictment issued by the grand jury, and the inability to be certain that the grand jury would have indicted on the amended charge. In the instant case we cannot be certain. We thus reverse.[2]

## II.  SUFFICIENCY OF EVIDENCE— FELONY MURDER (RAPE) AND RAPE

Appellant assigns as error the trial court's denial of his motions for judgment of acquittal on charges of felony murder (rape) (count one) and rape (count five). We find no error and affirm.

■ In deciding to submit these issues to the jury the trial judge need only have been satisfied that the government introduced enough evidence so that a reasonable person might find guilt beyond a reasonable doubt. *Curley v. United States,* 81 U.S. App.D.C. 389, 392–93, 160 F.2d 229, 232–33, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947). On appeal, we view the evidence in a light most favorable to the party prevailing below. *Saunders v. United States,* D.C.App., 317 A.2d 867 (1974). The evidence in this case is compatible fully with a finding that appellant raped and killed Rebecca Rieser on September 10, 1972.

There was evidence to support a conclusion that appellant was in the victim's room at the approximate time of the events which gave rise to the charges against him. Testimony established that appellant's fin-

2. Reversal of appellant's conviction for first-degree burglary necessitates reversal of his conviction for felony murder based on that burglary (count three) and makes it unnecessary to reach his contentions with regard to the propriety of jury instructions and sentencing in connection with his burglary conviction.

gerprints were found on the victim's dresser. His palm print was lifted from a Sunday newspaper which testimony established the victim had purchased at approximately 10:15 a. m. on her way home from church that morning. Appellant had keys to all apartments and rooms in the complex.

There was also evidence to support a conclusion that appellant had intercourse with the victim on the morning of her death. Intact sperm was found in her vagina. Fiber samples recovered from the victim's bedsheets, body, and clothing connected appellant with the victim. Moreover, appellant had admitted to co-workers of having engaged in intercourse at McLean Gardens on that morning.

There was evidence to support a conclusion that this intercourse was not voluntary. Evidence showed that the victim was an extremely orderly person, yet her room was disheveled when she was found, and her pants were inside out on the floor, missing a button. Her broken watchband was also found on the floor. There were strangle marks on the victim's neck. Although this evidence is circumstantial, we note that rape by its very nature rarely gives rise to eyewitness testimony.

■■■■ Because this court will not reverse a conviction on the facts as long as there is evidence which reasonably permits a finding of guilt, *Manago v. United States,* D.C.App., 331 A.2d 335, 336 (1975), and because we find evidence in abundance to support the verdict, we affirm appellant's conviction on counts one and five.

■■■■ Affirmance of appellant's conviction for felony murder compels us to vacate his concurrent sentence for second-degree murder. Second-degree murder is a lesser included offense of felony murder. *Fuller v. United States,* 132 U.S.App.D.C. 264, 293, 407 F.2d 1199, 1228–29 (1967) (en banc only on question whether concurrent convictions for first-degree felony murder and second-degree murder can stand), *cert. denied,* 393 U.S. 1120, 89 S.Ct. 999, 22 L.Ed.2d 125 (1968); *Jackson v. United States,* 114 U.S.App.D.C. 181, 183, 313 F.2d

572, 574 (1962). Because appellant failed to move below to have the issue of second-degree murder submitted to the jury only as a lesser included offense, and because we do not find that the trial court's failure to do so sua sponte was plain error affecting substantial rights, we will not reverse his conviction for second-degree murder. *Fuller, supra,* 132 U.S.App.D.C. at 295, 407 F.2d at 1230. *See also Watts v. United States,* D.C. App., 362 A.2d 706 (1976) (en banc); *Adams v. United States,* D.C.App., 302 A.2d 232 (1973). This does not, however, mean that his sentence on that conviction should stand. *Fuller, supra,* 132 U.S.App.D.C. at 298 n.52, 407 F.2d at 1233 n.52.

### III. MERGER OF FELONY MURDER (RAPE) AND RAPE

Appellant next contends that his conviction for rape must be vacated because this offense should merge into the felony murder which was based on it and for which appellant was also convicted and sentenced. Because the purposes of the felony murder doctrine would in this way be violated, and for reasons we shall discuss, we find no justification for the application of the doctrine of merger to felony murder. We thus affirm.

■■■■ Merger of two offenses is ordinarily appropriate when the lesser offense consists entirely of some but not all of the elements of the greater offense. *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932); *Hall v. United States,* D.C.App., 343 A.2d 35, 38–39 (1975). Thus, for example, assault merges into assault with a dangerous weapon, and assault with a dangerous weapon merges into armed robbery. *See Bates v. United States,* D.C.App., 327 A.2d 542 (1974); *Taylor v. United States,* D.C.App., 324 A.2d 683 (1974); *Quick v. United States,* D.C.App., 316 A.2d 875 (1974).

In determining whether merger is appropriate, this court has refused to analyze solely by abstract consideration of the statutes involved or the wording of the indictment, and has looked instead to the societal interests protected by the statutes under

consideration. *Hall v. United States,* D.C. App., 343 A.2d 35, 39 (1975);[3] *cf. Williams v. Oklahoma,* 358 U.S. 576, 79 S.Ct. 421, 3 L.Ed.2d 516 (1959).

Shortly after our decision in *Hall* we upheld separate convictions for first-degree premeditated murder and felony murder (burglary), holding that "the societal interests served by each statute are separate and distinct." *Blango v. United States,* D.C. App., 373 A.2d 885, 888 (1977). In further explaining this rationale, we later said, "the societal interest served by the burglary statute, protection of occupied dwellings, is separate and distinct from that of the murder statute, security and value of the person." *Harris v. United States,* D.C.App., 377 A.2d 34, 38 (1977).

■ For similar reasons we necessarily hold that the societal interests which Congress sought to protect by enactment of D.C.Code 1973, § 22–2401 (felony murder) and § 22–2801 (rape) are separate and distinct.[4] The rape statute is to protect women from sexual assault. The felony murder statute purports to protect human life—it dispenses with the need for the prosecution to establish that the accused killed with a particular state of mind, and instead permits the jury to infer the requisite intent from the fact that a felony was committed.[5] We find nothing in this legislation to sug-

gest that Congress intended the underlying offense (rape) to be nonprosecutable under the merger rule when the defendant is charged with felony murder. Accordingly there can be no merger of these offenses.

Appellant directs our attention to *United States v. Greene,* 160 U.S.App.D.C. 21, 489 F.2d 1145 (1973), in which the United States Court of Appeals held, *inter alia,* that conviction for rescue of a federal prisoner, a federal felony, merged into conviction for felony murder. The court cited no precedent for its holding, and indeed as Chief Judge Bazelon observed in his statement as to why he would grant rehearing en banc, "this court has affirmed both the underlying felony and the felony murder in countless cases."[6] *Id.* at 45, 489 F.2d at 1169.

■ *Greene* is not binding on this court[7] and we decline to apply its reasoning to this case. We find highly persuasive, however, the views expressed by Chief Judge Bazelon:

The government itself pointed out in its petition for rehearing that this merger was predicated on a wholly erroneous understanding of the felony murder doctrine. At common law, homicides were divided into two categories, murder and manslaughter, with murder requiring a showing of "malice." Any homicide com-

**3.** In *Hall,* this court held that simple assault was not a lesser included offense of obstruction of justice by assaulting a witness, and that conviction of the former did not merge into conviction of the latter. We noted that

the interests protected by the two statutes are widely disparate. The crime of obstructing justice is societal in that it is intended to insulate the criminal justice system from corruption whereas the crime of simple assault is intended to protect the physical security of individual citizens. [*Id.* at 39.]

*See United States v. Butler,* 149 U.S.App.D.C. 300, 462 F.2d 1195 (1972) (consecutive sentences for murder, housebreaking, larceny upheld); and *Irby v. United States,* 129 U.S.App. D.C. 17, 390 F.2d 432 (1967) (en banc) (consecutive sentences for housebreaking and robbery upheld), in both of which the United States Court of Appeals noted the different societal interests protected by each statute.

**4.** The divergent personal and societal interests offended by rape and murder were recognized recently in another context by the Supreme

Court in *Coker v. Georgia,* —— U.S. ——, 97 S.Ct. 2861, 2868–69, 53 L.Ed.2d 982 (1977) (death sentence for rape forbidden by Eighth Amendment as cruel and unusual punishment).

**5.** *See* R. Perkins, Criminal Law 45 (2d ed. 1969). For an excellent discussion of the felony murder rule, *see State v. Chambers,* 524 S.W.2d 826, 829 (Mo.1975) (en banc).

**6.** *See, e. g., Fuller v. United States, supra; Calloway v. United States,* 130 U.S.App.D.C. 273, 399 F.2d 1006, *cert. denied,* 393 U.S. 987, 89 S.Ct. 464, 21 L.Ed.2d 448 (1968); *Coleman v. United States,* 111 U.S.App.D.C. 210, 295 F.2d 555 (1962); *Carter v. United States,* 96 U.S. App.D.C. 40, 223 F.2d 332 (1955); *Wheeler v. United States,* 82 U.S.App.D.C. 363, 165 F.2d 225 (1947), *cert. denied,* 333 U.S. 829, 68 S.Ct. 448, 92 L.Ed. 1115 (1948).

**7.** *M.A.P. v. Ryan,* D.C.App., 285 A.2d 310 (1971).

mitted in the course of a felony was considered murder because malice could be implied from the commission of the felony. When homicides were further subdivided by statute into first degree murder, second degree murder and manslaughter, the doctrine of felony murder was preserved, and the underlying felony was viewed as providing the "premeditation" and "deliberation" otherwise required for first degree murder, as well as malice, where necessary.

Given this rationale for the felony murder doctrine, it strains credulity to hold that the underlying felony merges into the felony murder. The statute proscribing the underlying felony—robbery, for example—is designed to protect a wholly different societal interest from the felony murder statute, which is intended to protect against homicide.

The underlying felony is an essential element of felony murder only because without it the homicide might be second degree murder or manslaughter. Clearly, neither manslaughter nor second degree murder merges with any other felony like robbery or assisting a prisoner to escape. [*Id.* at 44–45, 489 F.2d at 1168–69 (footnotes omitted).]

We are impressed both with Chief Judge Bazelon's societal interest analysis and with his recognition that while the underlying felony is an element of felony murder it serves a more important function as an intent-divining mechanism. Consistent with this view it is clear that rape is not a lesser included offense of felony murder, and that merger is inappropriate even absent societal interest analysis.

Appellant also directs our attention to state court decisions which have applied the

merger doctrine to felony murder.[8] We find more persuasive the cases which have declined to apply merger in this situation.[9]

We cannot accept a construction of law the effect of which would be to render the underlying felony a nullity any time death occurred during its perpetration. To do so would encourage rather than deter crime.[10] We find nothing to suggest that this was the congressional intent. Appellant's conviction for rape is affirmed.

## IV. COMPETENCE TO STAND TRIAL

■ Appellant contends that the trial court erred in not inquiring further into the question whether appellant was competent to stand trial. We find no such error.

At a hearing on the question of appellant's competence held on August 21, 1973, the government produced two experts.

Dr. Richard Ratner, a psychiatric consultant at St. Elizabeth's Hospital, testified that he had examined appellant on December 22, 1972 and January 5, 1973, and had on both occasions found him cooperative and to exhibit no signs of behavior disorder. Dr. Ratner testified that appellant was oriented as to time, place, and events, including the circumstances surrounding the charges against him. Dr. Ratner asserted his belief that appellant had a rational, factual understanding of the proceedings against him and could assist counsel in his defense.

The government next called Dr. Thomas Polley, a clinical psychologist employed at St. Elizabeth's Hospital's pre-trial evaluation section. Dr. Polley testified that he had examined appellant on December 20, 1972, and December 22, 1972, and had found him well oriented and able to describe the

---

**8.** *See State v. Woods,* 286 N.C. 612, 213 S.E.2d 214 (1975); *Johnson v. State,* 314 So.2d 791 (Fla.App.1975); *State ex rel. Wikberg v. Henderson,* 292 So.2d 505 (La.1974); *State v. Hubbard,* 123 N.J.Super. 345, 303 A.2d 87 (1973); *State v. Carlson,* 5 Wis.2d 595, 93 N.W.2d 354 (1958).

**9.** *See United States v. Bolden,* 169 U.S.App. D.C. 60, 514 F.2d 1301 (1975) (felony murder, robbery conviction vacated on other grounds);

*United States v. Heinlein,* 160 U.S.App.D.C. 157, 490 F.2d 725 (1973) (felony murder, assault with intent to rape while armed); *Coleman v. United States, supra* note 6 (felony murder, robbery). *See also State v. Chambers,* 524 S.W.2d 826, 829 (Mo.1975) (en banc) (felony murder, stealing).

**10.** *See United States v. Butler,* 149 U.S.App. D.C. 300, 304, 462 F.2d 1195, 1199 (1972).

circumstances surrounding the charges against him. It was Dr. Polley's opinion, like Dr. Ratner's, that appellant would be willing and able to cooperate with and assist counsel in his defense. Dr. Polley testified that his examination of appellant revealed no active psychosis.[11]

Dr. Alec Whyte, a psychiatrist with the Forensic Psychiatry Office of the Superior Court, had also examined appellant. In a letter to the court dated June 2, 1973, Dr. Whyte reported that he found appellant generally competent, but lacking the specific ability to assist defense counsel properly.[12] Unfortunately, Dr. Whyte's presence at the competency hearing could not be procured. The government stated its willingness that the competency determination be delayed pending Dr. Whyte's testimony. At this point, the following discussion took place between Judge Stewart and defense counsel:

THE COURT: Mr. Shaffer, since commencement of your representation of Mr. Whalen, have you had or do you presently have, as his lawyer, not as a psychiatrist, but as his lawyer, any basis to assert or any basis to believe that he is unable to properly assist you, to respond to your inquiries?

MR. SHAFFER: No, I do not.

THE COURT: All right. I feel in view of the testimony which I have heard, the lack of any assertion of the defense of insanity, that the defendant is competent. Even Dr. Whyte agrees, as I best read his report. It seems to me that with all due respect, it's more legal than medical, and in the face of the testimony which I have heard, I will sign the appropriate order indicating the finding of competency.

Appellant argues that the trial court erred in making a competency determination without hearing testimony from Dr.

Whyte. We cannot say as a matter of law that the trial judge should have inquired further, and consequently we affirm his finding that appellant was competent to stand trial. Key to this determination is our refusal to substitute our judgment for that of the trial court in a situation in which reasonable persons could rightfully differ, and in which the trial court's finding had evidentiary support. *Freas v. Gitomer,* D.C.App., 256 A.2d 573, 574 (1969); *Johnson v. Lloyd,* D.C.App., 211 A.2d 764, 765 (1965). Although the testimony of Dr. Whyte might have shed additional light on the question of appellant's competence, he was unavailable. The testimony of Drs. Ratner and Polley, the letter from Dr. Whyte, the statement of appellant's attorney, Mr. Shaffer, and the trial court's familiarity with the circumstances and its opportunity to observe appellant's demeanor provided ample ground on which to make a reasoned decision.

Appellant's reliance on *Drope v. Missouri,* 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1974) and *Pate v. Robinson,* 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966) is misplaced. In *Drope,* the trial judge concluded that the psychiatric evaluation attached to petitioner's pretrial motion for continuance did not contain sufficient indicia of incompetence to warrant further inquiry. The judge thus directed that the case proceed to trial without a competency hearing. After trial had commenced, the judge was informed first that petitioner had attempted to choke his wife to death and subsequently that petitioner had shot himself. The trial judge nevertheless denied a mistrial. In reversing, the Supreme Court concluded that the trial judge had failed "to give proper weight to the information suggesting incompetence which came to light during trial." *Drope v. Missouri, supra,* 420 U.S. at 179, 95 S.Ct. at 907. In the instant

---

11. Appellant's mental condition was the subject of a prior case in this jurisdiction. *See Whalem v. United States,* 120 U.S.App.D.C. 331, 346 F.2d 812 (en banc), *cert. denied,* 382 U.S. 862, 86 S.Ct. 124, 15 L.Ed.2d 100 (1965).

12. Indeed, appellant's first attorneys had complained during an informal hearing on May 23, 1973, that they were experiencing difficulty representing appellant and eliciting his cooperation. They asserted that on this basis, they had reason to question appellant's competence to stand trial. On July 2, 1973, the court permitted them to withdraw and, with appellant's approval appointed new counsel, Mr. Shaffer.

case a hearing was held, and the record reveals that the trial judge, unlike his counterpart in *Drope,* was concerned with and sensitive to the question of appellant's competence to stand trial. Moreover, our disinclination to second-guess the trial judge finds support in *Drope:*

> There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiries to determine fitness to proceed. The question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts. [*Id.* at 180, 95 S.Ct. at 908.]

In *Pate, supra,* the Court held that petitioner was constitutionally entitled to a hearing on the issue of his competence to stand trial, notwithstanding his failure to demand one as required by Illinois statutes, and that the trial court erred in failing to invoke, sua sponte, the statutory proceedings.

*Pate* is similar to *Drope* and distinguishable from the instant case on two grounds. First, there was no competency hearing in *Pate.* Second, there were manifestations of incompetence during trial, specifically the repeated insistence of defense counsel that his client's present sanity was very much in issue, which there should have alerted the court to address the issue. In the instant case, defense counsel informed the court that he had no basis to believe or assert his client's lack of competence.

■ In sum, we find no basis to hold that the trial court erred in not inquiring further.[13]

## V. SEARCH AND SEIZURE OF HAIR SAMPLES

Appellant contends that the trial court erred in admitting into evidence head and pubic hair samples seized from him without a search warrant subsequent to his arrest. He asserts that there was no probable cause to search, and that in any event, no exigent circumstances existed to justify dispensing with the search warrant requirement.

Appellant was arrested for the rape and murder of Rebecca Rieser on September 14, 1972, at 8:45 a. m., by homicide Officer Thomas J. Kilcullen of the Metropolitan Police. At that time, he was already in police custody on another charge. Almost immediately, prior to appellant's presentment at 9:30 a. m., Officer Colin Alford, a police technician with the mobile crime office, took hair samples from appellant's head and pubic area. The trial court denied appellant's motion to suppress these samples at a hearing on October 3, 1973, and held that the challenged search was valid as incident to a lawful arrest.

■ There is some authority to support the trial court's holding. A search incident to a lawful arrest is a well recognized exception to the warrant requirement which has been justified by the reasonableness of searching for weapons, instruments of escape, and evidence of crime when a person is taken into official custody and detained lawfully. *United States v. Edwards,* 415 U.S. 801, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1975); *Cupp v. Murphy,* 412 U.S. 291, 93 S.Ct. 2000, 36 L.Ed.2d 900 (1973); *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Weeks v. United States,* 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914).

We hesitate to extend this rationale to the instant case, however, because it is not entirely clear whether the right to search an arrestee for evidence of crime without a warrant applies to a situation such as this, in which the evidence sought lacked for the most part an evanescent quality, *i. e.,* the possibility that it might dissipate or be lost or destroyed by the defendant, an accomplice, or the simple passage of time, which could justify an exception to the warrant requirement. *See Schmerber v. California,*

---

**13.** We reject for the same reasons appellant's contention that the trial court erred in not appointing *amicus* counsel to represent appellant at the competency hearing after it became clear to the court that defense counsel would not contest his client's competence.

384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966).

It can be argued that the Supreme Court has resolved this question in the affirmative. In *United States v. Edwards,* 415 U.S. 801, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1975), the Court upheld the warrantless seizure of petitioner's clothing, which police removed from him after he had been incarcerated for ten hours and which contained inculpatory paint chips. The Court deemed this a search incident to a lawful custodial arrest, subject to and satisfying the test of reasonableness. The Court neither relied on nor referred to the evanescent quality of the paint chips. When this is considered in light of the fact that the search took place ten hours after petitioner was arrested, a period during which a warrant could have been obtained, *Edwards* appears to carve out a broad exception to the warrant requirement for incidental searches. The *Edwards* exception does not seem to have been conditioned on the evanescent quality of the evidence seized.

We note, however, that the evanescence of fingernail scrapings was the basis for upholding their warrantless seizure in *Cupp v. Murphy, supra,* 412 U.S. at 295, 93 S.Ct. 2000, and that the paint chips in *Edwards* were similarly evanescent, even though the Court did not expressly rely on this factor.

More recently in *United States v. Chadwick,* —— U.S. ——, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977), the Court affirmed the suppression of marijuana seized from a footlocker without a warrant after petitioners were arrested. The Court rejected the government's contention that a warrantless search of property in possession of an arrestee was always constitutionally permissible if supported by probable cause. The Court noted that once government agents gained control of the footlocker there was "no longer any danger that the arrestee might gain access to the property to seize a weapon or *destroy evidence.*" *Id.* at 2485 (emphasis added). To this apparent departure from *Edwards,* the Court added the observation that police had had one hour of exclusive control of the footlocker before they searched it, during which they could have obtained a warrant. *Id.* at 2485–86.

■ In the instant case police could not base a warrantless search and seizure of hair samples on any realistic fear that appellant would destroy his own hair. Moreover, appellant was in custody at a police station and a warrant could easily have been obtained.[14] Although *Edwards* may be broad enough to support the admissibility of this evidence, *Cupp* and *Chadwick* engender doubts. We are not prepared at this time to hold that the warrantless search and seizure of hair samples from an arrestee is proper absent some additional exigent circumstance.[15] We need not, however, decide that question here because the other evidence of appellant's guilt in this case was so overwhelming as to render any possible error committed by admission of these hair samples harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## VI. VAGINAL SWABS

Appellant contends that the government mishandled vaginal swabs taken from the

---

**14.** *See Bouse v. Bussey,* 21 Cr.L. 2453 (7/21/77). In that case, appellant contended that his Fourth Amendment rights had been violated by defendant, a police officer who, acting without a warrant, had forcibly removed strands of appellant's pubic hair. The United States Court of Appeals for the Ninth Circuit noted that such a "warrantless search cannot be justified by exigent circumstances. Appellant was being held in custody pending trial, and there was no danger that the evidence sought might be destroyed before a warrant could be obtained." *Id.* The court accordingly held that appellant had a cause of action under 42 U.S.C. § 1983.

**15.** We are not unmindful that some courts have approved the warrantless taking of hair samples by finding the attendant intrusion sufficiently minor and reasonable to justify dispensing with the search warrant requirement. *See United States v. D'Amico,* 408 F.2d 331 (2d Cir. 1969); *People v. Cutler,* 73 Mich.App. 313, 251 N.W.2d 303 (1977); *Commonwealth v. Tarver,* 345 N.E.2d 671 (Mass.1975). We decline at this time to adopt this reasoning.

victim, thus depriving appellant of critical exculpatory evidence and his due process right to a fair trial, and violating his right to discovery under Super.Ct.Cr.R. 16. We disagree.

In the course of performing an autopsy on the victim, Dr. James Luke, the Chief Medical Examiner for the District of Columbia, prepared vaginal swabs which were tested in September 1972 by a government expert, Agent Cronin, for the presence of semen. Agent Cronin did not test the swabs for blood group substances, later testifying that he believed such an attempt would have produced inaccurate results in light of the likelihood of contamination from bacteria naturally present in the vagina.

The defense expert, Dr. Ruth Guy, examined the swabs in the summer of 1973. She testified that she was able to find both type A and type B blood group substances on the swabs, and that notwithstanding the possibility of bacterial contamination she had no doubt of the accuracy of her results, which showed that appellant could not have been the person who raped Rebecca Rieser.

The government called in rebuttal another expert, Dr. Alexander Weiner. Dr. Weiner testified against the efficacy of blood group analysis of the swabs, agreeing with Agent Cronin that the natural presence of vaginal bacteria precluded accurate results, and noting that, in any event, saline tests conducted by Agent Cronin to determine the presence of semen stripped the swabs of material necessary for blood group analysis.

Appellant asserts that this saline test amounted to mishandling of the swabs. He asserts further that the government packaged and stored the swabs in a manner which resulted in increasing the likelihood of bacterial contamination, and that the government was negligent in failing to test the swabs for blood type before subjecting them to procedures which created a risk of bacterial contamination.

■■ Appellant's contention that the government mishandled the swabs and thus deprived him of important exculpatory evidence is undermined fatally by the testimony of defense expert Dr. Guy in unequivocal support of the accuracy of her findings. What this argument really comes down to is that the jury did not accept Dr. Guy's testimony and believed instead the contrary testimony of government experts, who asserted that the swabs were of no scientific value for blood grouping *ab initio*. Where there is conflicting testimony the acceptance by the jury of testimony presented by either side is binding on us. If Dr. Guy was correct, she was able to arrive at a highly accurate, untainted result. If government experts were correct, no such result could ever have been reached, no matter how the evidence was handled. The jury believed the latter. We have no basis to upset the jury's finding, and we hold that it was arrived at fairly.[16] Moreover, even if we agreed with appellant that this evidence was mishandled, the other evidence against him—tests from other stained items, fingerprints, palm print, fiber samples, statement to co-workers, presence and opportunity—renders any error committed harmless beyond a reasonable doubt. *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).[17] Finally, rejection of appel-

16. Dr. Guy also testified that she found evidence of exculpatory AB blood grouping substances on the victim's panties and on a towel found at the scene of the crime. This the jury also apparently chose not to accept. Appellant does not contend that this evidence was mishandled.

17. Cases on which appellant relies principally do not support his argument. In *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution withheld from petitioner a copy of an extrajudicial ad-

mission by his codefendant that the latter, and not petitioner, had committed the actual homicide. The Court held this violative of due process. In the instant case, appellant was given complete access to the vaginal swabs, and, indeed, appellant's expert conducted tests the results of which, if believed by the jury, would have exculpated appellant.

*United States v. Bryant,* 142 U.S.App.D.C. 132, 439 F.2d 642, *aff'd on remand,* 145 U.S. App.D.C. 259, 448 F.2d 1182 (1971), like *Brady* and unlike the instant case presented a situation in which appellant was denied access to

lant's contentions with respect to this issue is, of course, fatal to his assertion that the government violated his rights to discovery under Super.Ct.Cr.R. 16.

## VII. PROSECUTORIAL COMMENT

■ Appellant contends that government counsel's closing argument included comments on appellant's failure to testify in his own behalf and that the trial court erred in not applying remedial sanctions after defense counsel objected. Government counsel's statement was as follows:

> What do you have in this case? You have a defendant who can't explain the time period or where he goes. *He has no explanation as to where he was during that time.* When he was asked where he was, he admitted, when he spoke to Spencer Jenkins, he said, "I been sleeping." He knows there's a time gap in there, and at that time he—a coincidence or proof of guilt?

The particular phrase to which appellant objects is "he has no explanation as to where he was during that time." This statement, appellant asserts, violates *Griffin v. California*, 380 U.S. 609, 613–15, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965), in which the Supreme Court held that the Fifth and Fourteenth Amendments forbid prosecutorial comment on an accused's failure to testify. *See also Manago v. United States, supra.*

We hold that government counsel's statement was not improper. Taken in context, the statement was clearly not a reference to appellant's failure to take the witness stand but referred instead to appellant's inability, on the morning of the rape and murder, to reply satisfactorily to a co-worker who had asked him where he had been.

This court has held that the standard for resolving such cases is "whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure to testify." *Blango v. United States*, D.C.App., 335 A.2d 230, 232 (1975). In *Byrd v. United States*, D.C.App., 364 A.2d 1215 (1976), this court rejected a contention similar to the instant one, noting that "the statement by its terms did not refer specifically to the [appellant's] failure to testify or invite the jury to consider such a failure in weighing the evidence." *Id.* at 1218. *See also Tuckson v. United States*, D.C.App., 364 A.2d 138 (1976), which recognizes the right of the prosecutor to make "reasonable comments on the evidence and to draw such inferences from the testimony as will support his theory of the case." *Id.* at 142.

In the instant case we believe that government counsel's statement made no suggestion, substantial or otherwise, of appellant's failure to testify, that no reasonable jury would so construe it, and that the statement was no more than a reasonable comment on the evidence. We thus find no merit to appellant's contention.

In summary, appellant's convictions for felony murder (first-degree burglary), and first-degree burglary are *reversed.* His

---

potentially exculpatory evidence. There government agents tape-recorded conversations between appellant and an undercover agent concerning an alleged sale of narcotics. The government subsequently destroyed the tape, which it asserted was unintelligible, before appellant was given an opportunity to hear it. Appellant contended that his narcotics conviction should be overturned on *Brady* grounds. Following remand, his conviction was affirmed, because, in the court's view, the negligence involved in the loss of the evidence while in the government's possession was outweighed by a totality of very strong evidence against appellant.

Finally, in *Marshall v. United States,* D.C. App., 340 A.2d 805 (1975), appellant was con-victed of robbery (purse snatching). There this court held, *inter alia,* that it was not error for the trial court to refuse to strike the complaining witness' testimony where the police had returned her purse to her and she had discarded it, making it impossible for appellant to subject it to fingerprint analysis. This court noted that the police had acted wrongfully in returning the purse before the defense was given an opportunity to examine it, but deemed highly speculative the exculpatory potential of the evidence of which appellant had been deprived. In the instant case, appellant experienced no such deprivation, and indeed the jury rejected appellant's exculpatory evidence.

sentence for second-degree murder is *vacated.* Appellant's convictions for felony murder (rape) and rape are *affirmed.*

*So ordered.*