**Ronald A. WILLIAMS (No. 81–712), Leon Johnson (No. 81–1531), and William L. Johnson, Jr. (No. 81–1535), Appellants,**

v.

**UNITED STATES, Appellee.**

**Nos. 81–712, 81–1531 and 81–1535.**

District of Columbia Court of Appeals.

Argued May 4, 1983.

Decided Oct. 2, 1984.

James Klein, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the briefs were filed, William J. Mertens, Public Defender Service, Washington, D.C., at the time the briefs were filed, and Linda Jacobson, Public Defender Service, Washington, D.C., were on the briefs, for appellant Ronald A. Williams. Elizabeth J. Branda, Public Defender Service, Washington, D.C., also entered an appearance for appellant Ronald A. Williams.

Calvin Steinmetz, Washington, D.C., appointed by the court, for appellant Leon Johnson.

R. Kenneth Mundy, Washington, D.C., for appellant William L. Johnson, Jr.

Regina C. McGranery, Asst. U.S. Atty., Washington D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and E. Thomas Roberts, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee. John A. Terry, Asst. U.S. Atty., Washington, D.C., at the time the brief was filed, also entered an appearance for appellee.

Before MACK and PRYOR, Associate Judges, and KERN, Associate Judge, Retired.[*]

[*] Judge Kern was an Associate Judge of the court at the time of argument. His status changed to Associate Judge, Retired, on May 25, 1984.

1. Appellant Leon Johnson was also convicted of carrying a dangerous weapon. D.C. Code § 22–3204 (1981).

2. Appellant Ronald Williams was sentenced to concurrent terms of imprisonment of 20 years to life for felony murder and 5 years to 15 years for first-degree burglary while armed. Appellant William Johnson was sentenced to imprisonment for not less than 7 years under the Federal Youth Corrections Act, 18 U.S.C.

PER CURIAM:

■ A jury convicted appellants of first-degree burglary while armed, D.C. Code §§ 22–1801(a), –3202 (1981), and felony murder while armed, *id.* §§ 22–2401, –3202.[1] Appellants argue that reversible error attended the admission of prior consistent statements of three government witnesses and that the prosecutor's reference to the death penalty during closing argument constituted misconduct necessitating reversal. Appellants Ronald Williams and William Johnson further assert that the trial court's instructions respecting the principle of aiding and abetting so confused the jury as to require reversal. We affirm the convictions; however, we remand for resentencing.[2]

I

The charges at issue arose out of the shooting death, in Southeast Washington, of Earl Saunders. The evidence adduced at trial demonstrated that on the night of December 29, 1978, appellants, accompanied by three young men—Michael Conyers, Carrington Brown and Joseph McLaughlin—were engaged in a mission to retaliate for the shooting by Lewis Saunders (Earl's brother) of Carlos Johnson, the younger brother of William Johnson. William Johnson drove to Lewis' apartment along with the group of avengers, three of whom—Conyers and appellants Leon Johnson and Williams—were armed with pistols and a shotgun. When the group neared the neighborhood where Lewis resided,

§ 5010(c) (1976) (FYCA). Appellant Leon Johnson was sentenced to imprisonment for a period not to exceed 9 years under the Federal Youth Corrections Act, *supra.* Because the felony murder and the underlying felony (here, armed burglary) merge, *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *see Doepel v. United States,* 434 A.2d 449, 459 (D.C.), *cert. denied,* 454 U.S. 1037, 102 S.Ct. 580, 70 L.Ed.2d 483 (1981); we remand with instructions to vacate the armed burglary conviction, *Brown v. United States,* 464 A.2d 120 (D.C.1983), and resentence appellants accordingly.

they saw Lawanda King, Lewis' girlfriend and the cousin of William Johnson. The men asked her to ascertain whether Lewis was at home. While appellant William Johnson and McLaughlin remained in the car, appellants Ronald Williams and Leon Johnson, along with Conyers and Brown, alighted from the vehicle and stationed themselves in an advantageous position near the apartment building in which Lewis resided. King then returned, reporting that Lewis was not at home but that Earl Saunders was alone in his apartment in a building across the street. As King approached the adjacent apartment building, Conyers and appellant Leon Johnson followed her from a distance. When she opened the door to Earl Saunders' apartment, Conyers and Leon Johnson pushed past her and fired their weapons at Saunders, fatally wounding him. The two gunmen then ran back to the awaiting car, as did Brown and appellant Williams, where they joined appellant William Johnson and McLaughlin and made good their escape.

In the early morning of December 30, 1978, the Metropolitan Police Department investigated a report of gunshots in Southeast Washington. An officer discovered Earl Saunders kneeling on the floor with his torso on the bed, shot in the head and back but still breathing. Saunders was taken to Greater Southeast Community Hospital and pronounced dead. The cause of death was later determined to be both the shotgun wound in the back of his head and multiple gunshot wounds in his upper trunk.

On May 16, 1979, Joseph McLaughlin gave a statement to Detective Warren Donald detailing his involvement in the crime. The government later agreed not to prosecute McLaughlin in exchange for his testimony at trial. On May 17, 1979, Michael Conyers gave a statement to Detective Donald specifying his involvement in the crime. Conyers, who had been indicted for first-degree murder while armed and felony murder, was subsequently permitted to plead guilty to second-degree murder while armed and first-degree burglary while armed. His sentence was deferred until after his testimony at appellants' trial. On May 22, 1979, Carrington Brown gave Detective Donald a statement describing his involvement in the crime. He later pleaded guilty to manslaughter while armed in exchange for his testimony at appellants' trial.

None of the appellants testified at the trial. Carlos Johnson, testifying on behalf of his brother, appellant William Johnson, stated that he did not recognize the Saunders brothers as the "crap" game robbers and had never mentioned the circumstances of his injury, or Lewis Saunders, to William. All three appellants presented character witnesses attesting to their reputations as law abiding, peaceful and nonviolent citizens.

## II

During cross-examination, Joseph McLaughlin was questioned about the details of the plea bargain he made with the government. McLaughlin testified that following his arrest, a police officer told him he could be charged as an accessory to first-degree murder. He further testified that he realized if he were charged with another crime, his parole for a prior conviction might be revoked, resulting in his immediate incarceration. Finally, McLaughlin stated that he agreed to testify truthfully at appellants' trial in exchange for immunity from all crimes relating to Earl Saunders' murder. The court found that this line of questioning attacked McLaughlin's motivation for testifying and, over objection from defense counsel, permitted a redacted form of his prior consistent statement made to police officers to be admitted into evidence during redirect to rehabilitate his credibility.

Similarly, defense counsel cross-examined Michael Conyers about his plea agreement. Conyers testified that he was indicted by a grand jury for first-degree murder, first-degree felony murder, and first-degree burglary while armed. He stated that after his arrest, police officers informed

him they knew of his involvement in the crime. Conyers further revealed that he entered into an agreement with the government in which he agreed to plead guilty to second-degree murder while armed and first-degree burglary while armed in exchange for dismissal of the first-degree murder charge. His sentencing was deferred until after he testified in the case against appellants. Conyers also stated he was aware that if incarcerated as an adult, he must serve a sentence of twenty years before becoming eligible for parole, but that if he were sentenced under the provisions of FYCA he might receive probation and, even if he served time, might have his criminal record expunged. The determination of whether he would be sentenced as an adult or under FYCA would not be made until after his testimony in this case.

Finally, Carrington Brown was cross-examined as to his plea arrangement. He testified that he was indicted by a grand jury of first-degree murder, first-degree felony murder and burglary while armed. He told the jurors that at the time of his arrest police officers revealed that they knew he was involved in the crime. Brown acknowledged that on January 28, 1980, he agreed to plead guilty to manslaughter and testify at appellants' trial in exchange for the government's dismissing all other charges. Brown also testified that he knew first-degree murder carried a minimum sentence of twenty years without parole, whereas manslaughter carried no mandatory sentence. He stated that this knowledge contributed to his decision to plead guilty to manslaughter. Brown had not been sentenced at the time of his testimony and he felt both the decision whether he would be sentenced as an adult or under FYCA and the term of his incarceration turned on his testimony. As in the case of McLaughlin, the trial court, on redirect by the government and over objection, permitted the government to introduce into evidence the prior consistent statements Conyers and Brown made to police. The challenges to these admissions are renewed on appeal.

Generally, prior consistent statements are inadmissible on the theory that repetition does not imply veracity, *Musgrove v. United States*, 441 A.2d 980, 985 (D.C.1982); *Scott v. United States*, 412 A.2d 364, 373 (D.C.1980), and therefore, such statements are inadmissible to bolster the testimony of an unimpeached witness. *Warren v. United States*, 436 A.2d 821, 836–37 (D.C.1981); *Rease v. United States*, 403 A.2d 322, 327 (D.C.1979). An exception to this rule permits the introduction of a prior consistent statement to rehabilitate a witness whose credibility has been undermined by a specific suggestion of fabrication or of a motive to lie. *Id.* at 328 n. 7; *Johnson v. United States*, 434 A.2d 415, 420–21 (D.C.1981). When used for rehabilitation, prior consistent statements must be directed only at the particular impeachment which occurred and must include a statement by the declarant that will support the particular testimony that has been impeached. *Musgrove v. United States, supra*, 441 A.2d at 985. Moreover, the previous statement "must have been made at a time when the witness did not have a motive to fabricate." *Reed v. United States*, 452 A.2d 1173, 1180 n.7 (D.C.1982). The statement need not have been made before the motive to fabricate arose; "[r]ather, the test is whether under all the circumstances, the declarant can be considered to have had a motive to lie at the time he made the statements." *Id.* at 1181 n. 8.

We agree with the government that, through the cross-examination of the witnesses on the subject of their plea agreements, defense counsel suggested that the witnesses had a motive to lie at trial and thereby triggered the application of the rules which permit admission of prior consistent statements. The prior statements, however, were made to law enforcement officials at a time when the witnesses were under arrest and knew they could be tried for first-degree murder. While each of the witnesses' statements was made before a plea agreement was struck, it cannot

be questioned that each declarant had a motive to lie to the detective who took the statement. *Cf. Johnson v. United States,* 434 A.2d 415, 421 (D.C.1981); *United States v. Sampol,* 204 U.S.App.D.C. 349, 399, 636 F.2d 621, 671 (1980) (per curiam) (statements made to person to whom declarant had no motive to lie). Thus, the trial court erred in admitting the previous statements of McLaughlin, Conyers and Brown since they were made at a time when the declarants were motivated to misstate the truth.

■ We find on the basis of the record in its entirety, however, that this error was harmless. The government's evidence of appellants' active participation in the crimes was formidable. This evidence, considered in conjunction with the court's detailed charge to the jury regarding the limited use of prior consistent statements, permits us to conclude with substantial certainty that the error did not sway the jury's verdict or affect appellants' substantial rights. *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

### III

During closing argument, the prosecutor stated:

> We submit what this case shows is that these men had a motive for revenge. [Carlos Johnson] got shot. The fact that the people who shot him may have been bad has nothing to do with this case. They are not on trial here. It's not for you to decide. In fact, we never could bring them into a courtroom because these people interfered. Took it upon themselves to be judge, jury and executioner.
>
> We don't have the death penalty in this city anymore. It's been eliminated.

Counsel objected to the reference to the death penalty and the court, accordingly, instructed the jury to disregard the prose-

cutor's remark. Appellants maintain that the prosecutor's statement constitutes reversible misconduct.

■ While comments calculated to arouse passion and prejudice are improper, *Viereck v. United States,* 318 U.S. 236, 63 S.Ct. 561, 87 L.Ed. 734 (1943), we are not convinced that, taken in the context in which the statement was made, the challenged comment constitutes misconduct. Assuming, *arguendo,* that the statement was improper, we will reverse only when such error rises to the level of "substantial prejudice." *Dyson v. United States,* 418 A.2d 127, 132 (D.C.1980). The test to determine whether substantial prejudice occurred as a result of the misconduct is "whether we can say, 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.' The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error." *Gaither v. United States,* 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969) (quoting *Kotteakos v. United States, supra,* 328 U.S. at 765, 66 S.Ct. at 1248 (footnotes omitted)). Applying this standard, we find that the government's strong case against appellants coupled with the court's instructions that the jury disregard the comment and the fact that the jurors were eventually instructed by the court, at the defense's request, on the penalties for various offenses, including first-degree murder, outweigh any possible prejudice injected by the prosecutor's comment. We, therefore, find that error here, if any, was harmless.

### IV

Following the instruction on first-degree premeditated murder while armed, the court initially charged the jury on aiding and abetting.[3] The court specifically told

3. The trial court told the jurors that

[U]nder the rule on aiding and abetting a defendant may be guilty of a crime charged in

the jury that "the rule on aiding and abetting also applies to the counts of the indictment charging first-degree burglary while armed and the felony murder charge while armed."

However, at the government's request, and over the objection of appellants, the court added the following:

There is no requirement that the aider and abettor have the identical intent of the principal at the time and place. He need not necessarily intend the particular crime committed by the principal. He is liable for any criminal act which in the ordinary course of things, was the natural and probable consequence of the crime that he advised, connived at, or counseled, or instigated, though, such consequence may not have been intended by him.

The court next instructed the jury on the elements of murder in the first-degree, felony murder while armed and reminded the jury that the "instruction with respect to the rule on aiding and abetting applies with respect to the offense or charge of felony murder while armed in the first degree."

The jury was then instructed as to the elements of first-degree burglary both as an element of the felony murder charged and as a separate, independent charge in the indictment. And, again, the court reminded the jury that "the rule on aiding and abetting, which [he] gave ... earlier

applies to the—also to the offense of burglary in the first degree while armed."

Appellants Williams, and William Johnson, neither one of whom entered the apartment where the murder was committed, contend that the added "natural and probable consequence" language in the instruction renders the charge erroneous under the circumstances of this case because the trial court failed to identify for the jury the predicate crime which formed the basis for the added instruction. However, this argument ignores the evidence adduced at trial. The need for the additional language concerning the natural and probable consequences of one's actions was manifest: the language was necessary to adapt the standard aiding and abetting instruction to the unique course of events described in the evidence adduced at trial. Appellants and their associates, armed and attempting to avenge the shooting by the Saunders, had first positioned themselves outside the residence of Lewis Saunders but, after discovering that he was not at home, rushed directly across the street into Earl Saunders' residence and shot him to death. The assertion that a predicate crime was unidentified must fail on this record. William Johnson and Ronald Williams were part of a group of persons arrayed outside Lewis' residence, prepared to kill him. When this armed band turned and charged directly across the street into Earl's apartment, with fatal consequences, the resulting murder was the natural and probable conse-

the indictment without finding that he personally, with his own hands and body, committed each of the acts constituting the offense, or that he was personally present when the crime was committed.

Any person who knowingly and intentionally advises, incites, or instigates an offense, or knowingly and intentionally aids, assists, or abets the principal or primary offender, is punishable just as though he were the principal or the primary offender. That is, he is as guilty of the offense as if he personally committed each of the acts which make up the offense. A person aids and abets another in the commission of a crime if he knowingly associates himself in some way with the criminal venture, with the intent to commit the crime, participates in it as something he

wishes to bring about, and seeks by some action of his to make it succeed.

Now, some conduct by a defendant of an affirmative character in furtherance of a common criminal design or purpose is necessary. Mere physical presence by a defendant at the time and place of the commission of the offense is not of itself sufficient to establish his guilt. However, mere presence would be enough if it is intended to and does aid the primary actor. It is not necessary that any specific time or manner of committing the offense has been advised or commanded, or that it shall have been committed in the particular way instigated or agreed upon. Nor is it necessary that there shall have been any direct communication between the actual perpetrator and the defendant.

quence of appellants' prior preparation to kill Lewis. *See Hackney v. United States,* 389 A.2d 1336, 1342 (D.C.1978), *cert. denied,* 439 U.S. 1132, 99 S.Ct. 1054, 59 L.Ed.2d 95 (1979).

*Affirmed.*[4]

MACK, Associate Judge, dissenting:

## I

For the reasons best known to my colleagues (*see Washington Gas Light Co. v. Public Service Commission,* 450 A.2d 1187, 1242 (D.C.1982)), I agree, wholeheartedly, with the majority's legal analyses treating issues with respect to the admissibility of prior consistent statements and alleged prosecutorial misconduct (as well as the conclusion that the conviction of Leon Johnson should be affirmed). I depart with the majority when it concludes that the trial court, in the circumstances of this case, did not err in giving, over the objection of appellants, an instruction compelling liability for a crime that was the "natural and probable consequence" of a counseled crime.

In the interest of brevity, I will not repeat the facts. I note at the outset, however (a fact that the majority has failed to mention) that appellants were acquitted of first-degree premeditated murder. The felony murder conviction, therefore, is supported, if at all, by the conviction for armed burglary with intent to assault. I also note—and I think this fact significant—that I read the record as confirming that the suggestion to burglarize in order to assault the actual victim, Earl Saunders, was that of appellant Leon Johnson, one of the young men who charged into the apartment house and did the shooting. The decision was made on the street; appellant William Johnson[1] was in an automobile at the time. Appellant Ronald Williams was standing on the street where he presumably heard Leon Johnson's suggestion;[2] he remained on the street during the burglary without making any comment that would justify a conclusion that he participated in the decision.

## II

Against this factual backdrop, the instruction given by the trial judge, in addition to the standard instruction on aiding and abetting, was as follows:

There is no requirement that the aider and abettor have the identical intent of the principal at the time and place. He need not necessarily intend the particular crime committed by the principal. He is liable for any criminal act which in the ordinary course of things, was the natural and probable consequence of the crime that he advised, connived at, or

---

**4.** Appellants Ronald Williams and William Johnson also raise several other contentions which we find unpersuasive. For example, appellant Williams asserts that the trial court erred in failing to recognize that it was vested with discretion to suspend the sentence for first-degree murder. We observe that the issue has recently been resolved against appellant in *Beale v. United States,* 465 A.2d 796, 805–06 (D.C. 1983).

Similarly, appellant William Johnson maintains that the prosecutor's cross-examination of his character witnesses was improper, necessitating reversal. While we recognize that some portions of the cross-examination were irrelevant and beyond the scope of direct, however, this limited questioning did not deprive appellant of a fair trial.

**1.** The government's theory was that William Johnson was the mastermind behind the plan

"to get" Lewis and Earl Saunders (described by the government as "two well-known neighborhood robbers") because of an unprovoked shooting of William Johnson's younger brother by Lewis Saunders (while Earl Saunders stood nearby with a sawed-off shotgun). While I have not dealt with the sufficiency of evidence issue, it bears repeating that we are not dealing with a conspiracy charge.

**2.** The government witness who concluded that the four men on the street made the decision to enter the apartment building, subsequently explained that she only heard one of them say "Let's go see Rock [Earl]." One of the four men testified that it was Leon Johnson who said "Let's get Rock instead." As to Ronald Williams, the evidence shows little more than guilty knowledge. *See United States v. Stanchich,* 550 F.2d 1294, 1300 (2nd Cir.1977).

counseled, or instigated, though such consequence may not have been intended by him.

It is this instruction that appellants Ronald Williams and William Johnson, neither of whom entered the apartment house where the murder was committed, and both of whom were acquitted of first-degree murder, challenge as confusing and misleading.[3] I agree.

This instruction said to the jury: defendants Ronald Williams and William Johnson are liable for the armed burglary (and therefore the felony-murder while armed) even if the burglary was not intended by them, so long as it was proved that the burglary was the natural and probable consequence of a predicate crime which they did aid and abet. In other words, the jury was told that in order to convict appellants of armed burglary (and therefore felony-murder while armed) they need not find that appellants intended an entry with intent to commit an assault, as long as that criminal offense was the natural and probable consequence of *some crime* appellants aided and abetted.

A problem arises with the accomplice instruction in this case, because there is no "crime" that serves as the predicate for an unintended but related burglary. The government, in a "down-to-earth" approach, counters appellants' argument by suggesting that "the only reasonable interpretation [of all the evidence] is that appellants and their cohorts had undertaken to burglarize the Saunders' apartment in order to kill them." However, the challenged instruction told the jury in effect that appellants need not have undertaken to burglarize. Ironically, it is the very reasonableness of the government's approach that poses a danger to the right of an accused to have his fate decided by jurors pursuant to accurate legal instructions befitting the crimes charged and the evidence adduced. One may certainly argue that

the jury here could have possibly concluded (at least as to appellant William Johnson) that the armed burglary (and therefore the felony-murder while armed) was the natural and probable consequence of the counselling of the crime of premeditated murder; yet the jury here acquitted appellants of premeditated murder. Because the jury found appellants not guilty as to the crime of premeditated murder, it could have reached the verdict of appellants' guilt on the armed burglary count (and therefore the felony-murder while armed count) only by improper application of the "natural and probable consequence" language found in the court's instruction. Moreover, the issue here is not one that can be summarily disposed of by concentrating upon the reality that jurors sometimes do return inconsistent verdicts. *See, e.g., Khaalis v. United States,* 408 A.2d 313, 342 (D.C.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980). The concern here is rather a basic one going to the charging and proof of the elements of two serious felonies. Conviction of the felony murder stands or falls upon the conviction of armed burglary; the *quid pro quo* for the conviction of the armed burglary in the absence of entry with intent is that the burglary be the natural and probable consequences of a predicate crime. In this case the jury was told it could convict in the absence of intent to burglarize; yet no predicate crime was identified that could form the basis for the natural and probable consequence instruction.

Therefore, no matter how much I may be tempted to paint with the broad brush of the majority, I cannot dismiss the issue by simply suggesting that "William Johnson and Ronald Williams were part of a group of persons arrayed outside Lewis' residence prepared to kill him." Because of the trial court's instruction, we have no way of knowing whether appellants have been convicted of armed burglary (and thus felony murder while armed) because these

---

**3.** This instruction has been described as a platitude, serving no useful purpose. "Its use is an invitation to reversal" since it may in some contexts mislead the jury. *Cohen v. United States,* 378 F.2d 751, 755 (9th Cir.), *cert. denied,* 389 U.S. 897, 88 S.Ct. 217, 19 L.Ed.2d 215 (1967). The instant case presents such a context.

were the natural and probable consequences of their outside presence or mental disposition.[4] I cannot ignore this possibility when the consequences flowing to appellants represent so high a price.[5] The fifth and sixth amendments guarantee that an aider and abettor, like a principal, have notice and grand jury consideration of the conduct that exposes one to the risk of such dire consequences. *See Whalen v. United States,* 379 A.2d 1152, 1156–57 (D.C.1977), *petition for reh'g denied,* 388 A.2d 894 (D.C.1978), *rev'd on other grounds,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). *See also Stirone v. United States,* 361 U.S. 212, 217, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960).

I would reverse the convictions of appellant William Johnson and Ronald Williams and remand for a new trial.

---

**4.** I note that the prosecutor argued to the jury that it should convict appellant Williams of first-degree felony murder because the killing was "the natural and probable consequence of everything [he] did ...." Thus under the circumstances of this case, we cannot say with any degree of certainty that what the jury could possibly have determined to be the predicate crime instigated by appellants (and which led by natural and probable consequences to the burglary) was even criminal conduct as determined by the legislature. *See Chiarella v. United States,* 445 U.S. 222, 237 n. 21, 100 S.Ct. 1108, 1119 n. 21, 63 L.Ed.2d 348 (1980) (a court "may not uphold a criminal conviction if it is impossi-

ble to ascertain whether the defendant has been punished for noncriminal conduct").

**5.** The trial court, obviously troubled by the imposition of sentence but stating that he had no other available option, sentenced Ronald Williams (then twenty-three years old with no criminal record) to a term of 20 years to life on the felony murder count and 5 to 15 years on the burglary count, to run concurrently. The other defendants, under 22 years of age with no criminal records, received sentences under the Youth Corrections Act (18 U.S.C. § 5010(c) (1982)) of imprisonment for nine and seven years.