**Rodney PROPHET, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 88–1514.**

District of Columbia Court of Appeals.

Argued Nov. 20, 1991.
Decided Jan. 31, 1992.

---

Stephen I. Singer, Public Defender Service, with whom James Klein and Hiram Puig–Lugo, Public Defender Service, Washington, D.C., were on the brief, for appellant.

Peter R. Zeidenberg, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty., and John R. Fisher and Elizabeth Trosman, Asst. U.S. Attys., Washington, D.C., were on the brief, for appellee.

Before FERREN, STEADMAN, and KING, Associate Judges.

FERREN, Associate Judge:

A jury convicted appellant of first degree felony murder while armed, D.C.Code §§ 22–2401, –3202 (1988 and 1991 Suppl.), and of armed robbery, D.C.Code §§ 22–2901, –3202 (1988 and 1991 Suppl.). Appellant raises four issues on appeal. He argues that (1) there was insufficient evi-

dence to sustain his conviction for armed robbery; (2) his statements to the police should have been suppressed as fruit of an unlawful arrest; (3) the trial court erred when it permitted the government to rehabilitate its key witness with a prior consistent statement uttered when the witness still had a motive to fabricate; and (4) the trial court's standard felony murder instruction misstated the scope of liability for an aider and abettor. We affirm the conviction for felony murder while armed. Because appellant's conviction for the underlying armed robbery merges with the felony murder conviction, however, we remand to the sentencing court with instructions to vacate the armed robbery conviction. *See Catlett v. United States*, 545 A.2d 1202, 1219 (D.C.1988), *cert. denied*, 488 U.S. 1017, 109 S.Ct. 814, 102 L.Ed.2d 803 (1989).

## I. THE FACTS AND PROCEEDINGS

On December 11, 1987, at about 9:45 in the morning, the decedent, Kendall Merriweather, walked down Martin Luther King Avenue, S.E., carrying books and a large radio "boom box." He passed a group of four other young men, among whom were appellant,[1] codefendant Jarrell Allen, government witness Anthony Humes, and Dennis Kingman,[2] standing near a public telephone at a gas station. Allen wore a blue jacket with black patches on the shoulders. As Merriweather passed by, Allen asked appellant, referring to the boom box, "Do you want it?" Appellant replied, "Yeah." Allen began walking after Merriweather; appellant followed Allen.[3] Appellant looked around, forward and backward, as he followed Allen. Then appellant stopped, watching Allen from a distance later measured to be 264 feet as Allen approached Merriweather and tried to take the boom box away from him. Merriweather backed away from Allen, shaking his head as if to indicate a negative re-

sponse. After a slight struggle, Allen shot Merriweather in the back with a .357 magnum revolver. Merriweather slumped against a parked car. Allen shot him again in the back and Merriweather fell to the pavement. Allen "cautiously" and "slowly" picked up the boom box and walked "casually" away through an alley near the shooting.

Appellant met Allen again at the other end of the alley through which Allen had fled. With Allen still carrying the radio, they walked together through the nearby woods toward the apartment of appellant's friend, Tyrone Wells, at 405 Orange Street, S.E. They stopped first in the basement of the apartment building at 405 Orange Street while police helicopters were circling overhead. Appellant knocked on the door of Tyrone Wells' apartment and entered, followed in ten or fifteen seconds by Allen, who was carrying the boom box. Allen handed the boom box to Wells, who took it to his bedroom and plugged it in. Wells returned to see Allen sitting on the couch, with the gun on top of the blue jacket beside him.

Three or four minutes after appellant and Allen had entered the apartment, there was another knock at the door. Wells called out, "Who is it?" "The police. Open up," was the response. Hesitating about a minute, Wells went to the door, turning his back on Allen. When Wells turned back around after admitting the police, he saw Allen coming into the living room from a back bedroom. As three police officers, one of whom was carrying a shotgun, entered Wells' apartment, both Allen and appellant dropped to the floor.

After obtaining permission to search the apartment, the police found ammunition for a .357 magnum, as well as shells for a .22 and a single shotgun shell, in Allen's coat pocket. They recovered a .357 magnum from beneath the mattress in the back bed-

---

1. Appellant has an I.Q. of 76. He was 17 years old at the time of the incident.

2. The fourth young man is identified by various witnesses as both Dennis Kingman and Dennis Kingwood. For the sake of consistency, we will refer to him as Dennis Kingman.

3. One government witness testified that appellant followed about a block behind Allen. Another said Prophet was only four or five paces back.

room from which Wells had seen Allen emerge. They also discovered the stolen boom box in Wells' bedroom. (Later, one of the fingerprints found on the boom box was identified as appellant's.)

The police arrested Allen and appellant inside the apartment, handcuffed them, and brought them outside. Anthony Humes identified them separately on the sidewalk outside the apartment building. Humes and Dennis Kingman had been stopped by police several times that morning between the time of the murder and the identification on the sidewalk. On one of those occasions, Humes had been handcuffed and transported by police to the scene of the shooting. Humes acknowledged at trial that he had been, and still was, afraid of being implicated in the shooting.

Later, at the police station, after being properly advised of his *Miranda*[4] rights, appellant told police interviewers that he had watched the shooting from a nearby gas station.[5] He acknowledged that earlier that morning he had seen Allen at a store called Robie's on the corner of Martin Luther King Avenue and 4th Street, S.E., holding a gun matching the murder weapon.

Before trial, appellant filed a motion to suppress his statement to police as fruit of an illegal arrest. After a hearing, the trial court ruled that appellant had been subjected to a valid *Terry*[6] stop, resulting in the police bringing him outside for the show-up identification, and that Humes' identification of appellant then provided probable cause to arrest. The following day, the trial court *sua sponte* amended its ruling, concluding that the handcuffing of appellant inside the apartment had transformed an otherwise valid *Terry* stop into an arrest. The court nonetheless denied the motion to suppress, reasoning that because the officers had been justified, under *Ter-*

*ry,* in bringing appellant outside, the mere fact that he was handcuffed when they did so should not result in suppression of his statement.

Anthony Humes testified for the government at trial, referring to the radio, that he had heard Allen ask "Do you want it?" and had heard appellant respond, "Yeah." Defense counsel, on cross-examination, elicited testimony that in Humes' statement to Officer Bobby Shephard,[7] Humes had reported that Allen had said that he (Allen) wanted the radio, but that Humes had said nothing about appellant. Humes said on the stand that he did not recall his statement to Shephard. The defense called Officer Bobby Shephard to complete the impeachment of Humes. Shephard testified that Humes had never mentioned that appellant had said anything about wanting the radio.

Over strenuous defense objection, the trial court allowed the prosecution to rehabilitate Humes by introducing a prior statement to the police consistent with his trial testimony on direct examination. The government called Lieutenant Eric Witzig, who testified that he had interviewed Humes at the police station on the afternoon of the murder. At the time he was interviewed, Humes was not a suspect in the murder. Witzig testified that Humes had told him only three hours after the murder that Allen had asked appellant, "Do you want it?" (meaning the decedent's radio) and that appellant had answered, "Yes." Immediately after this testimony, the trial court instructed the jury on the proper use of testimony about a prior consistent statement.

At the end of the trial, after instructing the jury on aiding and abetting the armed robbery, the trial court delivered the standard "Redbook" instruction on accomplice liability and felony murder. *See* D.C.

---

**4.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**5.** Although appellant estimated his own distance from the shooting to be about 50 to 75 feet, the distance upon measurement from the gas station where appellant stood to the scene of the shooting was 264 feet.

**6.** *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

**7.** Officer Shephard transported Humes in the back of his patrol car to the sidewalk outside 405 Orange Street, S.E. where Humes identified appellant and Allen.

CRIMINAL JURY INSTRUCTIONS 4.22 (3d ed. 1978). The jury returned a verdict of guilty on all counts.

## II. APPELLANT'S STATEMENTS AS FRUITS OF THE ARREST

### A. *The Entry and Search of Tyrone Wells' Apartment*

Appellant challenges the legality of both the police entry and their search of Tyrone Wells' apartment and the subsequent arrest. In contesting the entry, appellant argues that the trial court erred in ruling that, because he was a guest in Wells' apartment, he had no standing to challenge the entry. In support of his position, appellant cites *Minnesota v. Olson,* 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990), in which the Supreme Court held that an overnight guest in someone's home had standing to challenge an illegal search of the home because society would recognize as reasonable the guest's expectation of privacy there. *Id.,* 110 S.Ct. at 1689–90.

■ "In order to prevail on a motion to suppress, the movant must establish both that he [or she] had a legitimate expectation of privacy in the area searched, and that, in fact, the search was illegal." *Moore v. United States,* 468 A.2d 1342, 1345 (D.C.1983). Appellant can establish neither. This court has held, after *Olson,* that a visitor has the burden of showing that he or she was an invited overnight guest in order to establish a reasonable expectation of privacy in the host's home. *See Lewis v. United States,* 594 A.2d 542, 545 (D.C.1991). Appellant was not an overnight guest at Wells' home. He had been in the apartment only three or four minutes when the police arrived. Several other persons were present in the room with appellant. These factors all "cut[ ] against normal expectations of privacy." *See United States v. Robinson,* 225 U.S.App. D.C. 282, 288, 698 F.2d 448, 454 (1983) (appellant who was a guest and was found in room with another person in home where

several others were also present did not have standing to challenge warrantless search).[8]

### B. *The Arrest*

The trial court first ruled that the seizure of appellant in Wells' apartment was a valid *Terry* stop. The next day, *sua sponte,* the court announced that after further research it was changing its ruling, and that "the handcuffing in this case did result in a degree of detention so as to make the encounter an arrest" at a time when the information provided only reasonable suspicion, not probable cause. The court nonetheless denied appellant's motion to suppress, reasoning that because, under *Terry,* the police would have been justified in taking appellant outside for the "show-up," the mere fact that the police handcuffed appellant before they had probable cause to arrest should not result in the suppression of the identification.

Appellant argues that the trial court's determination that he had been arrested without probable cause was correct, and that the court accordingly erred in not suppressing the identification evidence. The government replies that the trial court erred in ruling that the police did not have probable cause to arrest and that, for this reason, the identification evidence was admissible. We conclude that at the time appellant was arrested in Wells' apartment, the officers had probable cause to make the arrest. Thus, the evidence was not suppressible.

■ Whether probable cause exists to justify an arrest is a mixed question of law and fact subject to our *de novo* review. *See Brown v. United States,* 590 A.2d 1008, 1020 (D.C.1991) (*de novo* review of probable cause determination, giving deference to trial court's factual findings) (quoting *United States v. Campbell,* 843 F.2d 1089, 1092 (8th Cir.1988)); *see also United States v. Hoyos,* 892 F.2d 1387, 1392 (9th Cir.1989), *cert. denied,* — U.S. —, 111

---

**8.** In any event, although the trial court ruled that the initial entry of Wells' apartment was non-consensual, it appears from the record that Wells' mother, who arrived on the scene after the police had gained entry, consented to the search of her apartment. Thus, even if appellant had standing, he had no basis for arguing that the search was illegal.

S.Ct. 80, 112 L.Ed.2d 52 (1990) (determination of probable cause is mixed question of law and fact in which legal issues predominate and is therefore subject to *de novo* review, with underlying facts reviewed for clear error).

▮ The facts developed at the suppression hearing reveal the following events. Pursuing leads from eyewitnesses to the murder, the police knew that two young black men named Rodney and Jarrell (nicknamed "Peanut"), one of whom wore a blue jacket, were suspects in a shooting, that they had stolen a boom box, and that they had been seen heading toward Orange Street, S.E. Less than an hour after the incident, two young black males, one of them carrying a boom box, were seen entering an apartment building on Orange Street, S.E. A police broadcast directed the officers to a particular apartment in the building. When the police entered that apartment, two young black men went down to the floor. One of them, later identified as Jarrell Allen, admitted that a blue jacket on the table was his; the police found ammunition in the pocket of the coat. The police found a boom box in one bedroom and a handgun hidden under the mattress in another bedroom in the apartment. The police then learned that the two youths were named Rodney and Jarrell.

On the basis of all this information, we conclude, contrary to the trial court's ruling, that the police had probable cause to arrest appellant. *See, e.g., Allen v. United States,* 496 A.2d 1046, 1048 (D.C.1985) (Court of Appeals looks to "totality of the circumstances" in determining probable cause). The police therefore acted lawfully in handcuffing appellant and taking him out to the sidewalk for a showup identification by Anthony Humes. Because the officers had probable cause to arrest appellant, there is no valid basis for invoking the exclusionary rule. Accordingly, although the trial court erred in ruling that appellant was arrested *without* probable cause, we conclude that the trial court properly denied appellant's motion to suppress.

III. SUFFICIENCY OF THE EVIDENCE

▮ Appellant contends the trial court erred in denying his motion for judgment of acquittal at the close of the government's case because there was insufficient evidence to establish beyond a reasonable doubt that he was guilty of aiding and abetting Allen in the armed robbery. We have held that a judgment of acquittal is properly granted only where there is no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt. *E.g., Shelton v. United States,* 505 A.2d 767, 769 (D.C.1986). Viewing the evidence, as we must, in the light most favorable to the government, drawing all reasonable inferences in the government's favor, and giving deference to the jury's right to determine credibility and weigh the evidence, *see Curry v. United States,* 520 A.2d 255, 263 (D.C.1987), we conclude that the trial court did not err in denying appellant's motion.

▮ To convict appellant of aiding and abetting, the government had the burden of establishing that an armed robbery had been committed, that appellant had participated in the robbery, and that he did so with guilty knowledge. *See West v. United States,* 499 A.2d 860, 865 (D.C.1985). An aider and abettor must in some way associate himself or herself with the venture, must participate in it as though wishing to bring it about, and must seek by his or her action to make it succeed. *Settles v. United States,* 522 A.2d 348, 357 (D.C. 1987); *Nye & Nissen v. United States,* 336 U.S. 613, 619, 69 S.Ct. 766, 769–70, 93 L.Ed. 919 (1949).

▮ In this case, a reasonable juror could find that appellant's affirmative response to Allen's query ("Do you want it?") helped set in motion the events which culminated in the robbery and murder. Appellant knew that Allen was armed. *See United States v. Grubczak,* 793 F.2d 458, 463 (2d Cir.1986) (government need only show that defendant was "on notice of likelihood of [gun] use"). He followed behind Allen, looking in all directions as a

lookout might do.[9] Appellant watched the robbery and murder and immediately met up with Allen at the other end of the alley through which Allen fled. The two went together, boom box in hand, to the apartment of appellant's friend, Wells. Thus, the jury could reasonably conclude that appellant failed to disassociate himself from Allen and tacitly approved Allen's actions. *See Settles,* 522 A.2d at 358. When viewed in the light most favorable to the government, the evidence was sufficient to withstand a motion for judgment of acquittal.

## IV. THE GOVERNMENT'S REHABILITATION OF A KEY WITNESS

Appellant argues that the trial court erred when it allowed the government to rehabilitate the testimony of Anthony Humes. Humes testified on direct examination that appellant had responded "Yeah" to Allen's query, "Do you want it?" Appellant's trial counsel impeached this testimony with that of Officer Shephard, who testified that, while he was transporting Humes to the show-up identification, Humes had said Allen had expressed a desire for the decedent's radio, but that Humes had not mentioned appellant's saying anything at all about the radio.[10] The trial court allowed the government, in rebuttal, to rehabilitate Humes by introducing Humes' prior consistent statement to Lieutenant Witzig when Witzig had interviewed him at the police station three hours after the murder. Witzig testified that during this interview Humes had told the same story he related at trial: that in response to Allen's query appellant had replied "Yeah," he wanted the radio. Immediately after Witzig testified, the trial court cautioned the jury on the proper use of prior consistent statements.

Ordinarily, prior out-of-court statements consistent with a witness's trial testimony are inadmissible in a criminal prosecution on the theory that repetition does not imply veracity. *Williams v. United States,* 483 A.2d 292, 296 (D.C.1984), *cert. denied,* 474 U.S. 906, 106 S.Ct. 275, 88 L.Ed.2d 236 (1985). "An exception to this rule permits the introduction of a prior consistent statement to rehabilitate a witness whose credibility has been undermined by a specific suggestion of fabrication or of a motive to lie" at trial. *Id.* (citing *Rease v. United States,* 403 A.2d 322, 328 n. 7 (D.C. 1979)). When used for a rehabilitative purpose, a prior consistent statement must be directed only at the particular impeachment that occurred and must support the particular testimony that has been impeached. *Id.* (citing *Musgrove v. United States,* 441 A.2d 980, 985 (D.C.1982)). Finally, the statement must have been made at a time when, considering all the circumstances, the witness did not have a motive to fabricate. *See Reed v. United States,* 452 A.2d 1173, 1180–81 (D.C.1982), *cert. denied,* 464 U.S. 839, 104 S.Ct. 132, 78 L.Ed.2d 127 (1983).

Appellant argues that because Humes' own role in the events leading up to the murder did not differ materially from that of appellant, and because Humes had been detained several times that morning by police investigating the murder, Humes—in order to keep the focus of police suspicion off himself—had a motive to fabricate at the time he made the inconsistent statement to Officer Shephard in the back of the squad car, *see supra* note 10, and thereafter through the time of the consistent statement to Lieutenant Witzig at the police station. Appellant premises this argument on Humes' testimony on cross-exami-

9. Although a witness's characterization of appellant's behavior as "acting as a lookout" was stricken, the jury could reasonably draw the same inference from the evidence.

10. Although appellant finds great significance in the "inconsistency" between Humes' trial testimony and his prior statement to Officer Shephard, we note that Humes made the statement to Shephard in "passing conversation" while

Shephard drove Humes to the Orange Street address so that Humes could identify Allen and appellant. Officer Shephard was not responsible for the investigation and was not taking notes. Humes never said that appellant was *not* involved or even that appellant had not spoken; rather, in his exchange with Shephard, Humes simply failed to mention any reference by appellant to the radio.

nation that he was still afraid of being implicated in the murder even at the time of trial.

■■■ "The trial court has broad discretion with respect to the admission or exclusion of prior consistent statements." *District of Columbia v. Bethel,* 567 A.2d 1331, 1336 (D.C.1990) (citing *United States v. Hamilton,* 689 F.2d 1262, 1273 (6th Cir. 1982), *cert. denied,* 459 U.S. 1117, 103 S.Ct. 753, 754, 74 L.Ed.2d 971 (1983)). Here, the trial court, considering all the circumstances, determined that any motive Humes might have had to lie would have dissipated by the time he spoke with Lieutenant Witzig. The court therefore admitted the prior consistent statement. We find no abuse of discretion.

Much of Humes' testimony was favorable to appellant, a fact which tends to undermine appellant's suggestion that Humes had a motive to fabricate or to embellish appellant's involvement in order to keep the focus of suspicion away from himself.[11] Furthermore, Humes—who was not under arrest—made the prior consistent statement after he had learned that appellant and Allen were under arrest and after he had identified them at a showup. This case, therefore, is distinguishable from *Williams,* where we concluded that there had been a motive to fabricate because the prior statements "were made to law enforcement officials at a time when the witnesses were under arrest and knew they could be tried for first-degree murder." *Williams,* 483 A.2d at 296. While the trial court would not have abused its discretion had it declined to admit Humes' prior consistent statement, we cannot say as a matter of law that on this record the court abused its discretion in admitting it.

### V. THE FELONY MURDER INSTRUCTION AND ACCOMPLICE LIABILITY

After first instructing the jury on the charge of aiding and abetting the armed robbery, the trial court gave the standard Redbook instruction on felony murder:

> Any killing, even committed with [sic] without the specific intent to kill, and even if accidental is murder in the first degree if committed in the perpetration or the attempt to perpetrate the offense of robbery.

> Now, if two or more persons acting together [are] perpetrating, or attempting to perpetrate the offense of robbery, and one of them in the course of the felony and in furtherance of the common purpose to commit the felony, kills a human being, both the person who commits the killing, and person or persons who aided and abetted the felony are guilty of murder in the first degree.

*See* D.C. CRIMINAL JURY INSTRUCTIONS 4.22 (3d ed. 1978).

Appellant argues for the first time on appeal that this instruction misstates the scope of accomplice liability on a felony murder charge because it eliminates the need for a jury finding that the accomplice aided and abetted a killing as well as having aided and abetted the underlying felony. Because appellant failed to object at trial, we review for plain error. *E.g., Watts v. United States,* 362 A.2d 706, 708 (D.C.1976) (en banc).

Appellant asks us to adopt the reasoning of a panel of the United States Court of Appeals for the Ninth Circuit in *United States v. Jones,* 678 F.2d 102 (9th Cir.1982). In that case, the appellant was one of four participants in a bank robbery in which another of the participants shot and killed a bank security guard. The court held that it was not enough for the jury to find that the appellant had aided and abetted a bank robbery in which a killing occurred; the trial court should have instructed the jury to determine whether the appellant had aided and abetted the killing itself. *Id.,* 678 F.2d at 106. Without such an instruction here, appellant argues, the trial court failed to instruct on every essential element of the crime, which we have held to

---

11. For example, Humes testified that appellant allowed Allen to get a block ahead of him before he followed; that he never heard appellant and Allen discuss any plan to shoot Merriweath-er, to rob Merriweather, to use a gun, to steal the radio, or to meet up after robbing Merriweather. He acknowledged that he never saw the radio in appellant's possession.

be "per se reversible 'plain error,' " failure to object notwithstanding. *Kind v. United States,* 529 A.2d 294, 295 (D.C.1987).

In the context of imposing accomplice liability for armed robbery, we recently held in *Ingram v. United States,* 592 A.2d 992, 1003–04 (D.C.), *cert. denied,* —— U.S. ——, 112 S.Ct. 667, 116 L.Ed.2d 757 (1991), that the accomplice is liable for the "while armed" element when he or she could "reasonably foresee" that a weapon would be required to perpetrate the robbery. In *Ingram,* we were interpreting the "natural and probable consequences" language of our accomplice liability cases, *see e.g., Morriss v. United States,* 554 A.2d 784, 789 (D.C.1989) (" 'accomplice liability extends to acts of the principal ... that were a natural and probable consequence of the criminal scheme the accomplice encouraged or aided' ") (quoting 2 WAYNE LaFAVE & AUSTIN SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 6.8(b) at 157 (1986)). Were we to apply this analysis in the felony murder context, as appellant urges, an accomplice to the underlying felony would be liable for the murder only if it was "reasonably foreseeable" that a killing could result in the perpetration of the underlying felony.[12]

■ We are bound, however, by this court's opinion in *Waller v. United States,* 389 A.2d 801 (D.C.1978), *cert. denied,* 446 U.S. 901, 100 S.Ct. 1824, 64 L.Ed.2d 253 (1980), which clearly enunciates the requirements in this jurisdiction for a felony murder conviction:

> First, the defendant or an accomplice must have inflicted injury on the decedent from which he [or she] died. Second, the injury must have been inflicted in perpetration of a specified felony. No distinction [is] made between principals and aiders and abettors for purposes of felony murder liability. *Only intent to commit the underlying felony need be proved.*

*Id.* at 807 (emphasis added). "All accomplices are culpable for the resulting death." *West v. United States,* 499 A.2d 860, 866 (D.C.1985) (affirming conviction for felony murder of both principal and aiders and abettors in attempted armed robbery). This is so because the intent requirement for murder, in the case against an aider and abettor, is satisfied solely by the aider and abettor's participation in the felony that resulted in the killing. *See United States v. Heinlein,* 160 U.S.App.D.C. 157, 167, 490 F.2d 725, 735 (1973).

The instructions given here invoked the required knowledge, not only of every element of armed robbery, but also of the essential elements of felony murder: that (1) during the commission of a felony and in furtherance of a common purpose to commit the offense (2) either the defendant or an accomplice kills a human being. *See Waller,* 389 A.2d at 807 (D.C.1978); *cf. Head v. United States,* 451 A.2d 615, 625 (D.C.1982). Accordingly, we conclude that the court did not err, let alone plainly err, in its instructions on felony murder.

*Affirmed but remanded for vacation of armed robbery conviction.*

---

**12.** Professors Scott and LaFave, in discussing the vicarious liability of an accomplice for the murderous act of his or her co-felon, state:

> Even though [two co-felons, *A* and *B* ] have made [no agreement to rob *X* by killing him], if in the process of robbing or attempting to rob *X, B* 's gun goes off accidentally, killing *X, A* would be guilty of the felony murder of *X* as much as *B* would be, under the rule concerning parties to crime that all parties are guilty for deviations from the common plan which are the *foreseeable consequences* of carrying out the plan (an accidental shooting during an armed robbery being a typical example of a foreseeable deviation from the plan to rob).

WAYNE LaFAVE & AUSTIN SCOTT, JR., HANDBOOK ON CRIMINAL LAW § 71 at 553 (1972) (emphasis added).