**Lloyd J. MORTON, Appellant,**

v.

**UNITED STATES, Appellee.**

**No. 95–CF–422.**

District of Columbia Court of Appeals.

Argued Jan. 19, 1999.

Decided Aug. 12, 1999.

---

Carol A. Terry–Blume, Washington, DC, appointed by the court, for appellant.

Alyse Graham, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney, and John R. Fisher and Arthur G. Wyatt, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL and RUIZ, Associate Judges, and KERN, Senior Judge.

FARRELL, Associate Judge.

Found guilty by a jury of distributing cocaine, appellant contends primarily that the trial court erred in refusing to suppress his on-scene identification and money removed from his possession as the fruits of an unjustified warrantless entry by the police into the house in which they seized him. In its initial brief on appeal, the government argued only that appellant had no "standing" to challenge the search and seizure because he had no protectible Fourth Amendment interest in the dwelling, which belonged to someone else. At oral argument the court pressed the government on whether, assuming we disagreed with it on that point, it was defending the warrantless entry and resulting obtention of evidence on the merits—in particular, on the ground that exigent circumstances justified the warrantless entry. In a post-argument letter, the government adhered to its decision to defend the search and seizure solely on grounds that appellant could not invoke the Fourth Amendment's protections. Citing *Rose v. United States*, 629 A.2d 526 (D.C.1993), the government asked us not to attempt to "decide the case on the basis of issues and arguments [it] advisedly [had] chosen not to raise in support of the judgment." *See id.* at 538 (declining to consider merits of search and seizure where, as here, the court "confront[ed] a deliberate decision by the government, not an inadvertent failure, to argue [only lack of standing]").

On the authority of *Rose*, we defer to the government's litigating position and do not reach the constitutional validity of the warrantless entry. We do so in part because, as in *Rose*, "this is not a matter we could easily resolve [in that] the answer is 'beyond serious debate.'" *Id.* at 537 (citation omitted).[1] Instead, we confine ourselves to deciding whether, as the government contends, appellant had no expectation of privacy in the house entered and searched.[2] Although the record is not well-developed on this issue, we conclude from the Supreme Court's most recent teaching on the subject in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), that the government's position must be rejected. We therefore reverse the judgment and remand for further proceedings.[3]

## I.

The facts adduced at the suppression hearing were essentially as follows. An undercover officer bought two bags of cocaine from appellant in the 900 block of I Street, N.E. Watched by another officer, appellant then walked east to a row house at 1010 I Street, N.E. and entered it. Less than five minutes later, an arrest team that had been summoned knocked on the door of the house and, when the door

---

1. We say this even though, as to the identification, we think an argument was at least available to the government under *New York v.. Harris*, 495 U.S. 14, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990). *Compare Bryant v. United States*, 599 A.2d 1107 (D.C.1991), *with Rose*, 629 A.2d at 545 (Wagner, C .J., dissenting).

2. As the Supreme Court has pointed out, "it is inherent in ... an entry [into a house to arrest or detain a person] that a search for the suspect may be required before he can be apprehended." *Payton v. New York*, 445 U.S. 573, 588, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted).

3. Taking into account all of the evidence including the identification, we reject appellant's argument that the evidence was insufficient to support his conviction. *See, e.g., Hill v. United States*, 541 A.2d 1285, 1287–88 (D.C. 1988).

was opened, entered immediately. They saw appellant standing "back toward the kitchen area." They seized him and took him outside, where he was identified as the seller of the drugs. A search of him yielded unmarked currency. No one gave consent to the officers' entry into the home, and, as pointed out, the government does not argue that "hot pursuit," exigent circumstances generally, or any other doctrine rendered the warrantless entry lawful.

Appellant had no ownership interest in the residence and did not live there. His lone witness at the suppression hearing, Earley Green, Jr., did live there, was present at the time of the entry by the police, and had known appellant for "about ten years." Asked whether appellant "was ... a frequent visitor in your house," he replied, "Like family." On the occasion in question appellant was there "by [Green's] invitation."

## II.

The government contends that these facts are much too sketchy to establish appellant's "capacity to claim the protection of the Fourth Amendment," which required both that he had "a subjective expectation of privacy" in the invaded place and that this expectation was "legitimate," in that it is "one that society is prepared to recognize as reasonable." *Minnesota v. Olson*, 495 U.S. 91, 95–96, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (citation and internal quotation marks omitted). The government points out that there was no evidence that appellant ever spent a night at 1010 I Street, that he and Green were relatives, that he had a key to the residence or kept personal items there, that he had permission to come and go at his leisure, or that he would remain there for any length of time when he visited—in short, there was no showing of factors of the kind present in our prior decisions recognizing a protected Fourth Amendment interest in the place searched. *Compare, e.g., Rose*, 629 A.2d at 531–32, *with*

*Hill v. United States*, 664 A.2d 347, 353 (D.C.1995), *and Prophet v. United States*, 602 A.2d 1087, 1089, 1091 (D.C.1992). *See also Olson*, 495 U.S. at 98–99, 110 S.Ct. 1684 (holding that an overnight guest "has a legitimate expectation of privacy in his host's home" because "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society"). The difficulty with the government's—and our dissenting colleague's—position is that it does not come to grips with the Supreme Court's most recent analysis of how "a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights." *Carter*, 119 S.Ct. at 472. We first summarize the holding of *Carter*, and then apply it to this case.

### A.

On its facts, *Carter* presented the issue of whether a person present in another's home for a "purely commercial ... transaction," for only a "relatively short period of time," and having no "previous relationship with" the householder, could claim the Fourth Amendment's protections. *Id.* at 473–74. A majority of five Justices answered this question in the negative. A four-Justice minority, by contrast, would have held that, "[t]hrough the host's invitation, the guest gains a reasonable expectation of privacy in the home" without regard to "the duration of [the] stay," its "purpose," or the "[degree of] acceptance into the household." *Id.* at 482 (Ginsburg, J., dissenting) (internal quotation marks omitted). Of key importance is that the majority opinion depended on the concurrence of Justice Kennedy, who joined the opinion expressly because "its reasoning" was "consistent with [his] view that *almost all social guests* have a legitimate expectation of privacy, and hence protection against unreasonable searches, in their host's home." *Id.* at 478 (Kennedy, J., concurring) (emphasis added).

Differing from the dissent in this respect, Justice Kennedy stated that "[t]he

homeowner's right to privacy is not at issue in this case." *Id.* at 479.[4] Rather, he asserted, unless *Rakas v. Illinois,* 439 U.S. 128, 143, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), was to be overruled in its rejection of the notion that "anyone legitimately on the premises" shares the owner's legitimate expectation of privacy, the defendants had to establish their independent privacy right in the form of "a meaningful connection to [the homeowner's] apartment." *Carter,* 119 S.Ct. at 479. Nevertheless, Justice Kennedy agreed with the dissent "that reasonable expectations of the owner are shared, to some extent, by the guest," and in particular he was of the view that "most, if not all, social guests legitimately expect that, in accordance with social custom, the homeowner will exercise her discretion to include or exclude others for the guests' benefit." *Id.* That analysis "suggest[ed] that, *as a general rule, social guests will have an expectation of privacy in their host's home."* *Id.* (emphasis added). According to Justice Kennedy, however, the respondents-defendants in *Carter,* though invited into the apartment, had "established no meaningful tie or connection to the owner [Thompson], the owner's home, or the owner's expectation of privacy," *id.:*

> [R]espondents have established nothing more than a fleeting and insubstantial connection with Thompson's home. For all that appears in the record, respondents used Thompson's house simply as a convenient processing station, their purpose involving nothing more than the mechanical act of chopping and packing a substance [*i.e.,* cocaine] for distribution. There is no suggestion that respondents engaged in confidential communications with Thompson about their transaction. Respondents had not been to Thompson's apartment before, and they left it even before their arrest. The Minnesota Supreme Court, which overturned respondents' convictions, ac-

knowledged that respondents could not be fairly characterized as Thompson's "guests." 569 N.W.2d 169, 175–176 (1997); *see also* 545 N.W.2d 695, 698 (Minn.Ct.App.1996) (noting that Carter's only evidence—that he was there to package cocaine—was inconsistent with his claim that "he was predominantly a social guest" in Thompson's apartment).

*Id.* (Kennedy, J., concurring). In light of this analysis, the dissenting Justices thought "it noteworthy that five Members of the Court would place under the Fourth Amendment's shield, at least, 'almost all social guests.'" *Id.* at 483 n. 2 (Ginsburg, J., dissenting) (quoting majority opinion).

### B.

The government does not argue that appellant entered 1010 I Street for a "purely commercial" purpose such as depositing the proceeds of the drug sale or resupplying himself. Even though he headed there directly after the sale, no evidence supported either supposition. Instead the government seems to argue that, as a case emphasizing the commercial reason for the defendants' presence in the apartment, *Carter* has little to say about what showing of a privacy interest must be made by a guest who does not enjoy the status of overnight guest as in *Minnesota v. Olson, supra.* The suggestion, in other words, is that *Carter* leaves undisturbed our prior decisions requiring what might be termed proof of *Olson*-equivalent status—facts such as possession of a key, a demonstrated pattern of coming and going, keeping clothes on the premises, and the like—before a guest may acquire the protected privacy interest of the owner.

We do not regard ourselves free to read *Carter* in this limited a fashion. First, although the *Carter* majority viewed the overnight guest in *Olson* "as typifying those who may claim the protection of the

---

4. *Compare* 119 S.Ct. at 482 (Ginsburg, J., dissenting) ("My concern centers on an individual's choice to *share her home* and her

associations there with persons she selects." (emphasis added)).

Fourth Amendment," 119 S.Ct. at 474, it plainly did not imply that only that "degree of acceptance into the household" would suffice, *id.* at 473; otherwise the Court would have had no need to acknowledge that the defendants—for whom the apartment "was ... simply a place to do business"—occupied a middle status somewhere "between" that of the *Olson* guest and an invitee "simply permitted on the premises" (*Rakas*), though "closer to" the latter. *Id.* at 474. More importantly, the opinion of a fifth Justice whose vote was decisive obviously must be taken seriously. Justice Kennedy, as we have said, joined the majority only because its opinion was consistent with his "view that almost all social guests have a legitimate expectation of privacy." *Id.* at 478. If anything, he appeared to be of the view that only someone approximating the non-guest status the state Supreme Court had assigned the *Carter* defendants—who had "nothing more than a fleeting and insubstantial connection" to the home, *id.* at 479—could be *denied* Fourth Amendment protection. Nothing in Justice Kennedy's analysis suggests he would require an *Olson*-equivalent showing before a defendant may assert Fourth Amendment rights in a dwelling into which he has been invited. Our attempt to read the "tea leaves" of how the Supreme Court would decide this case must be guided by that recognition.

The record in this case is thin regarding appellant's connection to the Green home (or the home where Green "lived"), but it is enough to show that he was more than one "simply permitted on the premises." *Id.* at 474. Green invited him in on this occasion as a person he had known for some ten years. Asked whether appellant was "a frequent visitor in your house," Green answered, "Like family." Hence it cannot be said that, as in *Carter*, appellant had no "previous relationship with [the householder]," *id.* at 473, or "had not been to [Green's] apartment before." *Id.* at 479 (Kennedy, J., concurring). Indeed, the commonsense understanding of "[l]ike family" would be that he frequented the

house with something like the regularity of a family member, and so had achieved "a degree of acceptance into the household." *Id.* at 473. And, as explained, the fact that he entered the house right after selling drugs allows the conjecture of a "commercial" link between the acts, but nothing more.

Following the common thread in the various opinions in *Carter* that at least social guests of the host generally have a legitimate expectation of privacy, we hold that appellant met his burden of showing that he had a protectible interest in the house the police entered in order to seize him. As the government concedes that this issue is dispositive, the evidence obtained as a result of the entry should have been suppressed.

\* \* \* \*

It remains only for us to say that this holding does not "gut[ ] law enforcement efforts in stemming the trafficking of illegal drugs that are upon this record prudent police work." *Post,* at 188 (dissenting opinion). Judge Kern does not take issue with our deference, under *Rose, supra,* to the government's refusal to argue hot pursuit, exigent circumstances, the doctrine of *New York v. Harris, supra* note 1, or any other basis on the merits for upholding the search and seizure. Nor does he himself make any such argument. If in fact this were a case of "fleeing felons claiming 'sanctuary'," *post,* at 188 —which is just another way of saying "hot pursuit"—we are confident the government would not have rested on its argument that the Fourth Amendment does not apply.

The judgment of conviction is, therefore,

*Reversed.*

KERN, Senior Judge, dissenting.

The majority concludes that "appellant met his burden of showing that he personally had a protectible interest in the house the police entered to seize him." The majority's conclusion rests upon its "attempt

to read the 'tea leaves' of how the Supreme Court would decide this case ...." The majority's reading leads it to declare that the trial court erred in denying, for lack of standing, appellant's motion to suppress evidence of his on-scene identification by an undercover police officer who purchased drugs from him just several minutes before another police officer seized him in a house to which he had immediately repaired upon selling the illicit drugs. Upon the particular circumstances of this case and under a reading of the Supreme Court's decision in *Minnesota v. Carter*, 525 U.S. 83, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998), I cannot agree with the majority's conclusion. There, the Court, referring to its decision in *Rakas v. Illinois*, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), stated:

> Central to our analysis was the idea that in determining whether a defendant is able to show a violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." ... Thus, we held that in order to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; *i.e.*, one which has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

*Carter, supra*, 119 S.Ct. at 472 (citing *Rakas, supra*, 439 U.S. at 140, 143–44 n. 12, 99 S.Ct. 421).

It is my view that under the salient circumstances here appellant failed to demonstrate a reasonable expectation of privacy. The record reflects that Officer Darrell Young, an investigator of the Metropolitan Police Department, testified that he had worked for the Vice Unit for almost

nine years and participated in "[o]ver a thousand [drug arrests]." He explained at trial "a buy-bust operation" as follows:

> A buy-bust operation is when you have an undercover officer. You send him into a high-drug area. At which time he goes in and goes through the area and finds someone that he believes may be selling illicit narcotics.
>
> At which time the undercover officer makes a purchase. He then leaves the area. He goes back to his vehicle.
>
> He then conducts a preliminary field test on a small portion of the white-rock substance and let's you know if it's positive for whatever narcotics that the undercover has made his purchase.
>
> In return, the undercover officer hands the guy an undetermined amount of U.S. currency which is prerecorded police department funds.
>
> He then gives a lookout to the arrest team that the subject—of the subject that he was involved in a narcotics sale with. At which time, the arrest team moves in and stops anyone that matches the description that the undercover officer has given.
>
> Once the guy is stopped, the undercover officer is then notified that they have him stopped at a particular location. The undercover officer then comes in and does a ride-by identification. And he positively ID's the subject that he purchased from.
>
> The guy is then searched and you look for the prerecorded funds. Anything that's—that—that's drug related which could be pagers, money, any additional drugs are seized in reference to the arrest.

The undercover officer in the instant case was Derrick Wallace. He testified that he was working in the 900 block of I Street, N.E., at around 4:00 p.m., on February 11, 1993, when he met appellant and asked him if he was working.[1] Appellant

---

1. There is some suggestion in the record that

residents in the area had alerted the police of

replied with a question of what did the officer want. The officer answered that he wanted "a twenty," which meant a twenty-dollar rock of crack cocaine. The two men then walked a short distance into the alley next to a store in the 900 block of I Street, where appellant gave Wallace two ziplock bags "containing a white-rock substance" and Wallace gave appellant "twenty dollars of prerecorded MPDC funds." This transaction took less than a minute and a half. Officer Wallace observed appellant walk east on I Street and across 10th Street "where there is some row houses."

Wallace testified that he walked west on I Street to his unmarked car, where he "conducted a field test on a portion of the narcotics which tested positive for cocaine." This test, which the officer described, takes about 20 seconds. Then, the undercover officer radioed a description of appellant to the arrest team which had already received a general description of appellant from Investigator Albert Parker.

Parker testified that he was secreted in a so-called observation post in the 900 block of I Street, and had observed appellant and Wallace, the undercover officer, "using their hands like they was receiving something from one another or giving something." Parker testified that as appellant "walked in the eastbound direction, he got closer to my vision where I can identify who he was." Parker then radioed the arrest team, giving them "a tentative lookout of the subject [appellant]," the direction of his travel, and "emphasizing that I needed them there quick. . . . I described the location that the defendant was going inside of."

Investigator Parker further testified that he watched the arrest team "respond to the location" which was 1010 I Street, N.E. He saw that "maybe two or three [of the arrest team] went inside, and a couple of them was like outside watching the perimeter." Shortly thereafter, Investigator Parker saw police officers come out of 1010 I Street with appellant. The officers entering the house had driven to the location on I Street. Investigator Parker estimated that (1) some two minutes elapsed between the time he saw appellant walk into 1010 I Street and the time appellant exited this house with the officers, and (2) some five minutes had elapsed between the time he first saw appellant with Officer Wallace and the time appellant walked into the house during all of which time he was watching appellant, "except for the time he went in the alley."

Officer Haythe testified that on the afternoon in question he was assigned to the arrest team that was a part of the buy and bust operation. He received by radio a lookout for a person matching a description of appellant who had entered a house at 1010 I Street. Within "no more than five minutes" of receiving the lookout Haythe and another investigator knocked on the door. When the door was opened, the officers "saw the defendant [appellant] back toward the kitchen area." Haythe and his fellow officer, Darrell Young, "approached the defendant [appellant], stopped him, . . . and took him outside to see if the . . . undercover officers could identify him." Haythe explained that "[t]he undercover officer have [sic] to definitely know that's the person before we can place him under arrest."

Officer Young, an investigator, testified that he was a member of the arrest team and he searched appellant. He found money on appellant's person but *not* the money that had been pre-recorded and given to appellant by the undercover officer in exchange for the crack cocaine.

Officer Smith, qualified as an expert on drug sales in the District of Columbia, opined that it was not "unusual for a drug

on-going drug activity. When asked if there was any rumor or complaint about any particular building in the area being frequented by drug users, Officer Wallace responded, "I'm sure they have a narcotic complaint for houses around here, but which houses, I could not tell you."

dealer not to have prerecorded funds or drugs on his person at the time of his arrest." Officer Smith explained:

Because often times you find that individual[s] that sell drugs there are aware of different investigative techniques that we use.

And if they suspect that an individual that they just sold drugs to are [sic] using prerecorded or marked money, they may try to pass off that money before they're apprehended or stopped by the police.

Appellant filed a pretrial Motion to Suppress Evidence, contending "that the detention and search of his person was not supported by even a reasonable articulable suspicion of criminal activity." Citing to *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), appellant urged: "Put simply, the minimal threshold suspicion of criminal activity complained of are [sic] lacking." Appellant further argued in his suppression motion "that he has standing to contest the legality of the warrantless, nonconsensual entry and nonconsensual search of his person. He was a welcome visitor in another person's home at the time of the illegal entry . . . ."

Appellant presented at the hearing of his pretrial motion on February 15, 1995, a Mr. Green who testified that he lived at 1010 I Street, N.E., on the date appellant "got arrested," and that he had known appellant for "about ten years." When asked by appellant's counsel whether appellant "was a frequent visitor in your home," Mr. Green testified, "Like family." He further testified in answer to counsel's question whether appellant was in the house at the time of his seizure "by your invitation," that "Yes, he was."

On cross-examination by the prosecutor, Mr. Green testified that appellant "doesn't live there." Mr. Green further testified that he was not the person who opened the door to the house on the day that the police arrived and knocked at the door.

The record reflects that appellant testified in his own defense at the trial and stated that he had been living with his girl friend at the time of the alleged crime here. He testified that on the day in question he left where he was living and "[c]aught the bus over to northeast . . . where all my friends and relatives live there around that area." He visited Green and used his phone, and then went to the basketball court and played there. Finally, he was picked up and driven to a market by another friend who then dropped him off in the 900 block of I Street where he "went to 1010 I Street to use the phone." Mr. Green, according to appellant, let him into the house. Mr. Green's two nephews and brother were also present. According to appellant, the police came into 1010 I Street "a good two minutes" later. However, he testified that once the door was opened, it was "[a] matter of seconds" from the time "the door was opened for the police until they got [me]."

On cross-examination, appellant recounted that he had walked east on I Street past the alley and crossed 10th Street to get to 1010 which he entered, and that he was in the kitchen where the phone was located, when the police entered. Appellant testified that although he had not seen "any police officers out on the street," "[i]t wasn't even two minutes" before they were at the door of 1010 I Street. "It was briefly, like if they was right behind me."

The trial court denied appellant's motion to suppress, concluding that appellant "does not have standing with respect to any sort of search . . . of the apartment in which he was found." The trial court cited to *Lewis v. United States,* 594 A.2d 542 (D.C.1991), *cert. denied,* 502 U.S. 1115, 112 S.Ct. 1225, 117 L.Ed.2d 460 (1992), and noted that "the evidence here is that Mr. Morton [appellant] is no more than a . . . visitor to the dwelling."

The trial court went on to conclude:

Beyond that, I think that the police were justified in going into the apart-

ment in hot pursuit of Mr. Morton [appellant].... [A]n undercover officer had made a purchase from a person he thought was Mr. Morton [appellant] ... another officer had been observing that transaction, [and] saw Mr. Morton go into the apartment.

So ... I think, under *Hilliard versus United States* [2] ... there was probable cause to believe ... that a felony had been committed and that who'd committed it was in ... in the address to which the—the police officers entered.... [S]ince I think the entry was justified in hot pursuit of Mr. Hilliard [sic], the identification of Mr. Hilliard [sic] was not obtained through exploitation of any illegality.

And consequently the motion is denied.

I note that in *Hilliard, supra* note 2, 638 A.2d at 706, this court stated in pertinent part:

The Fourth Amendment prohibits the warrantless and non-consensual entry into a suspect's home for the purpose of effecting a routine felony arrest, absent probable cause and exigent circumstances. Only limited exigencies have been recognized as justification for warrantless searches or arrests. The hot pursuit of a fleeing felon is one of these recognized emergencies. The continuous pursuit of a suspect from the scene of the crime provides persuasive circumstances for application of the "hot pursuit" doctrine. Under such circumstances, the suspect may not evade arrest by simply retreating to a private dwelling. [Citations and footnote omitted.]

In *Hilliard*, this court described the salient circumstances:

Here, the experienced narcotics officers were in a known narcotics area when they observed the suspect transfer a plastic packet containing ... [what] they believed to be drugs. As soon as someone called out the alert that the uniformed officers were present, the suspect ran into an apartment which the officers knew to be used as a "shooting gallery," and the officers followed. These circumstances were sufficient to provide probable cause for the officers to believe that the suspect distributed drugs, a felony in this jurisdiction. Therefore, the officers' warrantless entry into the apartment where appellant was arrested was lawful under the "hot pursuit" doctrine.

*Id.* (footnote and citations omitted).

The parties to this appeal have presented briefs and argument to this court. Subsequent to the oral argument of this appeal, the United States Attorney's Office advised by letter of January 25, 1999:

In our brief, we had argued only that the appellant lacked standing to challenge the warrantless entry into Mr. Green's home; we had chosen, at that time, *not* to argue in the alternative that exigent circumstances justified the warrantless entry. At oral argument, the court kindly offered us the opportunity to revisit out position on this question. After further discussion and review, we respectfully advise the court that we wish to adhere to our original decision *not* to present the alternative argument that exigent circumstances justified the warrantless entry in this case. [Emphasis added.]

Accordingly, mindful of our decision (by a divided court) in *Rose v. United States,* 629 A.2d 526, 538 (D.C.1993), we are required to address *only* the issue in this case whether appellant had standing under the particular circumstances here to raise the claim that the police violated *his* Fourth Amendment rights when they entered the house of Mr. Green at 1010 I Street, N.E., and seized appellant after having observed him sell drugs, pocket prerecorded money and walk a block away

2.   638 A.2d 698 (D.C.1994).

and several minutes later into Green's house.

The Supreme Court in *Carter, supra,* stated that

> The text of the Amendment suggests that its protections extend only to people in "their" houses. But we have held that in some circumstances a person may have a legitimate expectation of privacy in the house of someone else.... [F]or example, we decided that an overnight guest in a house had the sort of expectation of privacy that the Fourth Amendment protects.

119 S.Ct. at 473 (citation omitted). However, the Court went on to note that while "an overnight guest in a home may claim the protection of the Fourth Amendment, ... one who is merely present with the consent of the householder may not." *Id.*

This court has stated, "a visitor in another's home bears the burden of showing that [he] had a reasonable expectation of privacy in that home." *Rose v. United States,* 629 A.2d 526, 531 (D.C.1993) (citing *Prophet v. United States,* 602 A.2d 1087, 1091 (D.C.1992)). *See also Lewis, supra,* 594 A.2d at 545 ("[W]hile an overnight guest has a reasonable expectation of privacy in the host's residence, a mere guest at a party does not."). In *Prophet,* this court held that a defendant lacked standing where the defendant was not an overnight guest, was but one of several persons in the apartment, and the police arrived approximately three to four minutes after the defendant had entered. 602 A.2d at 1091.

In *Rose, supra,* 629 A.2d at 530–31, this court held that a showing that the defendant was an overnight guest is not an indispensable prerequisite to establish standing. This court held that a defendant had standing to challenge an allegedly illegal search of and seizure from an apartment belonging to the defendant's close relatives (the defendant's aunt and uncle), where the defendant had a key to the apartment, and was a regular visitor. *Id.* at 531–32. The court concluded that the

defendant in *Rose* "was considerably more than ... a casual visitor." *Id.* at 532.

A review of the case law on standing in other jurisdictions leads me to the conclusion that the status of being invited into another's home, *standing alone,* is insufficient to establish a reasonable expectation of privacy on the part of the invitee to the house searched. *See, e.g., State v. Johnson,* 132 Ariz. 5, 643 P.2d 708, 710 (1981); *People v. Cowan,* 31 Cal.App.4th 795, 800, 37 Cal.Rptr.2d 469, 471 (1994); *State v. Cohen,* 146 Ill.App.3d 618, 100 Ill.Dec. 166, 496 N.E.2d 1231, 1237 (1986) (holding social guest with no proprietary interest in the property lacked standing); *Stout v. State,* 479 N.E.2d 563, 566 (Ind.1985); *People v. Craig,* 155 A.D.2d 550, 551, 547 N.Y.S.2d 407, 408 (N.Y.App.Div.1989) (holding defendant had no standing to challenge his arrest in a friend's house).

I find instructive a decision by the Illinois Court of Appeals:

> At most, [the defendant] was a social guest in a place where he had an invited right to be, but had no other interest in the premises or its contents. It has been held that to have standing to challenge the search of a residence one must show an unrestricted right of occupancy, custody or control of it; it is insufficient if one is only occasionally on the premises as a guest or invitee.

*Cohen, supra,* 100 Ill.Dec. 166, 496 N.E.2d at 1237 (citing *United States v. Baron–Mantilla,* 743 F.2d 868, 870 (11th Cir. 1984); *United States v. Adamo,* 742 F.2d 927, 947–48 (6th Cir.1984)).

Further, a familial relationship to the person to whom the residence belonged, standing alone, would not be sufficient to find that an invitee had standing. *See State v. Ponder,* 54 N.Y.2d 160, 445 N.Y.S.2d 57, 429 N.E.2d 735, 736–37 (1981) (holding defendant had no reasonable expectation of privacy in grandmother's home where defendant was one of thirty grandchildren who occasionally spent the night, but had no particular room assigned

for his use). These requirements are consistent with *Rakas, supra,* which specifically rejected the "legitimately on premises" standard of *Jones v. United States,* 362 U.S. 257, 267, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), stating it was too broad to measure Fourth Amendment rights. 439 U.S. at 142, 99 S.Ct. 421.

Here, appellant first conducted a drug sale and then took refuge in the house of a friend where it may be fairly inferred that he disposed of his ill-gotten gains before the police could seize him. I note that the Supreme Court in *Carter rejected* a claim of standing where the defendant was invited on the premises by the householder to conduct a drug transaction, and had no prior connection to the householder. 119 S.Ct. at 473–74.

As I have also noted, the Supreme Court in *Carter* reminded us that "[c]entral to our analysis was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights" he must demonstrate *not only* that he personally has an expectation of privacy in the place searched *but also* "that his expectation is reasonable; i.e, one which has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" 119 S.Ct. at 472 (citing *Rakas, supra,* 439 U.S. at 143–44 n. 12, 99 S.Ct. 421). I am not prepared to accept the majority's proposition that those who sell drugs to police officers and then walk immediately into a friend's house to drop off the profits have under these circumstances an expectation of privacy that is recognized and permitted by society.

The majority's "tea leaves" have produced a decision that guts law enforcement efforts in stemming the trafficking of illegal drugs that are upon this record prudent police work.[3] The majority's decision provides sanctuary to one who is fleet enough of foot to reach the home of a friend before the police can catch him for the crime he has committed in their presence. It is ironic that as we approach the Twenty–First Century the majority would take us back to the Twelfth Century doctrine of fleeing felons claiming "sanctuary," as they reach the designated safehouse. I would uphold the trial court's ruling that under the particular circumstances here appellant had no reasonable expectation of privacy and hence no standing that *his* Fourth Amendment rights were violated.

---

**3.** The majority in rendering its decision professes to foresee how the Supreme Court would decide this case. Yet, the majority stoutly declines to see how its own decision would impair the eminently reasonable police response to neighborhood complaints of persons openly selling drugs: the Department's so-called buy and bust operation. The record reflects that such operation quite properly requires the undercover officer buying the drugs with marked money to field test his purchase *before* fellow officers "bust" the seller. During these crucial several minutes, the seller can blithely walk into a friend's house where he can then thwart the police by not only hiding his profits but, according to the majority, claiming the householder's Fourth Amendment rights.